# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CATHLEEN MCDONOUGH, Individually and on behalf of all others similarly situated, | : : : : | Case No. 09-cv-00571 (SRC) (PS) |
| Plaintiffs, | : : : | **AMENDED CLASS ACTION COMPLAINT** |
| vs. | : : | |
| HORIZON BLUE CROSS BLUE SHIELD OF NEW JERSEY, INC., | : : : | **JURY TRIAL FOR ALL CLAIMS SO TRIABLE** |
| Defendant. | : : | |

Plaintiff Cathleen McDonough ("Plaintiff McDonough"), by her attorneys, Nagel Rice LLP, individually and on behalf of all others similarly situated, states:

## I.    SUMMARY OF CLASS ACTION CLAIMS

1.    This Amended Class Action Complaint concerns Defendant Horizon Blue Cross Blue Shield of New Jersey, Inc.'s ("Defendant Horizon") improper payments for "out-of-network" ("ONET") healthcare services.    Plaintiff Cathleen McDonough ("Plaintiff McDonough") is a Subscriber in a Smaller Employer Health Plan ("SEHP") from Defendant Horizon.  Through the wrongful and unlawful actions alleged herein, Defendant Horizon paid less than it was obligated to pay for ONET, and Plaintiff McDonough and other Subscribers suffered monetary injury as a result.

2.    In addition, Subscribers to ERISA and non-ERISA large health plans have suffered monetary injury as a result of defendant Horizon's improper payments for ONET healthcare services.

3.    Thus, the Class of Subscribers are all persons in the United States who are, or

were, from February 9, 2003, members of any large or small employee health plan insured or administered by Defendant Horizon and subject or not subject to ERISA who received medical services or supplies (including, *inter alia*, surgery, anesthesia, and the like) from an out-of-network provider and received reimbursement less than the provider's billed charge.

4.       Plaintiff McDonough and other Class Members bring this action as a class action, alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA").  In addition, Plaintiff McDonough alleges violations of the applicable New Jersey Small Employer Health Plan regulation (the "New Jersey SEHP Regulation").  In addition, Plaintiff McDonough alleges violations of Horizon insurance contracts not governed by ERISA.  As alleged herein, Plaintiff McDonough and other Class Members were and continue to be injured by underpayments made by Defendant Horizon for services provided by Non Participating Providers ("Nonpars").  Those underpayments are pervasive and result from systematic operating procedures employed by Defendant Horizon affecting millions of Subscribers to Defendant Horizon's health insurance policies.

5.       Many health insurers, including Defendant Horizon, offer health insurance plans that differentiate between coverage for medical treatment from in-network providers who have negotiated discounted rates with the insurer, known as "participating" providers or "Pars," and ONET providers who charge insured consumers their usual, non-discounted rates, known as "non-participating" providers or "Nonpars."   Health insurance plans that permit insured individuals, known as "Members," to seek medical care from ONET providers are more expensive than plans that limit Members to care provided by in-network providers – *i.e.*, such healthcare insurance plans require higher premium payments.

6.       When visiting a Par, Members are only responsible for copayments, co-insurance

and payment for non-covered items, if any, at the time of service. In contrast, Nonpars may collect their full charges directly from patients at the time of service and are not required to accept reduced rates for procedures performed because they do not have a signed contract with a particular managed care entity. Rather than require Members to pay out-of-pocket and in full for medical services rendered, Nonpars may also agree to accept an assignment of benefits, which occurs when a Member authorizes his or her health benefits plan to remit payment directly to the provider for covered services. Managed care entities may refuse to recognize a Member's assignment and still remit payment to the Member. Whether or not the health plan honors the assignment and pays the amount owed for ONET services directly to the Nonpar, the Nonpar is entitled to bill the Member for the amount of the charge that exceeds the amount that the Member's health plan covers.

7.     During the Class Period, Defendant Horizon Members paid an increased premium for the right to choose to receive ONET services. Defendant Horizon contractually promises that it will pay Nonpars at the lesser of their billed charge or the usual, customary and reasonable amount ("UCR," also known as "U&C" and "R&C") for the services rendered by Nonpars. Defendant Horizon also contractually promises its Members that the UCR for a service is the prevailing charge charged by most providers of comparable services in the locality where the Member received the service, with consideration given to the nature and severity of the Member's condition, as well as any complications or unusual circumstances that would require additional time, skill, or experience on the part of the Nonpar. To price Nonpar claims during the Class Period, Defendant Horizon heavily relied upon a computer database it licensed from a third party, Ingenix, Inc. ("Ingenix" or the "Ingenix Database"), which fails to comply with the definition of UCR contained in Defendant Horizon's insurance contracts.

8.    Defendant Horizon's underpayment scheme affected, and continues to affect, hundreds of thousands of Members who have had to pay more for ONET services as a result of Defendant Horizon's illegal conduct.  The primary instrument used to accomplish this scheme to defraud Plaintiffs is a data services platform known as the Ingenix Database, maintained by Ingenix, Inc. which is wholly owned and operated by UnitedHealth Group, Inc. ("UHG"), the second largest healthcare insurer in the United States.  During the Class Period, Defendant Horizon contracted with Ingenix to provide ONET services data claims and uniform pricing schedules which are used to calculate reimbursements for ONET services at artificially low rates (hereinafter "False UCRs") that are presented as UCRs.  The False UCRs are, in fact, substantially below the actual UCR rate.

9.    When Defendant Horizon used Ingenix data to price Nonpar claims, it failed to disclose critical facts about the Ingenix Database and the methodology that Defendant Horizon used to make its ONET services reimbursement decision.  Using the False UCRs, Defendant Horizon was able to under-reimburse Plaintiffs for ONET services.  Defendant Horizon's non-disclosure of material facts prevented its Members and the Nonpar providers who treated them from effectively challenging or appealing its UCR determinations.  Although Defendant Horizon is aware of serious, systemic flaws in the Ingenix Database, Defendant Horizon concealed those flaws in its written communications with Plaintiff McDonough and other Class Members.  For example, the Ingenix Database inappropriately averages the charges of all providers regardless of provider type or specialty.  It also fails to consider provider-specific, patient-specific and procedure-specific factors that affect charges.  These and other flaws were not disclosed to Members by Defendant Horizon in violation of its fiduciary obligations.

10.    Upon information and belief, during the Class Period, Defendant Horizon used an

older, outdated version of the Ingenix Database to price UCR, in violation of the Member's contracts and without the required disclosure to its Members or Nonpars.

11.    Defendant Horizon's Nonpar Pricing Methods systematically under-reimbursed Plaintiffs for services provided by Nonpars, and in violation of federal and state law as alleged herein.

## II.   SUMMARY OF RELIEF SOUGHT IN THIS CLASS ACTION

12.    As to subscribers to SEHP plans, although the New Jersey Regulation requires Defendant Horizon to use the Ingenix database, Defendant Horizon's failure to update the Ingenix database results in improper reimbursement of ONET charges and monetary injury to SEHP subscribers.

13.    As to subscribers of ERISA large plans, Defendant Horizon's use of the flawed, outdated and corrupted Ingenix database causes monetary injury to those subscribers.

14.    As to subscribers of non-ERISA plans, Defendant Horizon's use of the flawed, outdated and corrupted Ingenix database causes monetary injury to those subscribers.

15.    As alleged in this Amended Class Action Complaint, Defendant Horizon breached the terms of its health plans by making inappropriate and invalid UCR determinations. Upon information and belief, Defendant Horizon further reduced or minimized Nonpar payments by using multiple surgical, assistant and co-surgeon reductions that were not adequately disclosed to Members or Nonpars. In this putative class action, Plaintiffs seek reimbursement for their unpaid benefits, as well as other appropriate declaratory, equitable and legal relief to remedy Defendant Horizon's violations of federal law and the New Jersey SEHP Regulation.

## III.   JURISDICTION AND VENUE

16.    Plaintiffs assert subject matter jurisdiction for their ERISA claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d). These claims are all brought under federal statutes and

necessarily involve adjudication of one or more federal questions.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. Section 1367.

17.     Venue is appropriately laid in this District under the applicable federal venue statutes, including 28 U.S.C. § 1391, 18 U.S.C. § 1965 and 29 U.S.C. § 1132(e)(2), because, among other reasons, Defendant Horizon conducts a substantial amount of business in this District.

## IV.     PARTIES

18.     Plaintiff Cathleen McDonough is a citizen and resident of the United States of America, State of New Jersey, County of Union (Summit).  Since May 2005,  Plaintiff McDonough has been a member of a health plan fully insured by Defendant Horizon and sponsored by a New Jersey small employer.

19.     Defendant Horizon is a corporation under the laws of the State of New Jersey with its principal place of business located at Three Penn Plaza, Newark, New Jersey

## V.     PLAINTIFF'S EXPERIENCES WITH HORIZON

20.     Plaintiff McDonough has been a member of a Horizon New Jersey SEHP health plan between May 2005 and the present.

21.     Each of Plaintiff McDonough's New Jersey SEHP plans provide for reimbursement for ONET charges based on a "reasonable and customary" charge standard, which is defined in an identical manner in each policy:

> **Reasonably and Customary** means an amount that is not more than the lesser of:
> - the usual or customary charge for the service or supply as determined by Horizon BCBSNJ, based on a standard approved by the Board; or
> - the negotiated fee schedule.
>
> The Board will decide a standard for what is Reasonable and Customary under this Policy.  The chosen standard is an amount which is most often charged for a given service by a Provider within the same geographic area.  For charges that are not determined by a negotiated fee schedule, the Covered Person may be billed

for the difference between the Reasonable and Customary charge and the charge billed by the Provider.

22.     During the Class Period, Defendant Horizon has failed to update or verify the reliability of the Ingenix data.

23.     During the Class Period, Defendant Horizon has failed to comply with the terms of Plaintiff's health plans by systematically making UCR determinations that reduced the allowable amount without valid, updated or compliant data to support such determinations.

24.     Defendant Horizon's EOB records sent to Plaintiff McDonough via U.S. mail were uninformative, false and misleading.

25.     Plaintiff McDonough utilized ONET providers on several occasions, including, but not limited to, the following instances:

(a)     On May 6, 2005, Plaintiff McDonough received health services from Metropolitan Cranofacial, an ONET provider.  The claim was processed ONET on May 14, 2005.  The item was subject to Plaintiff McDonough's $1,000 deductible. Of the $1,325.00 that was billed, Defendant Horizon allowed and applied $429 towards Plaintiff McDonough's deductible.   With respect to the aforesaid health services from Metropolitan Cranofacial, Defendant Horizon sent, via U.S. Mail, Plaintiff McDonough an EOB that was uninformative, false and misleading.

(b)     On July 17, 2007, Plaintiff McDonough received gynecological health services from Dr. Richard Luciani, an ONET provider. The claim was processed ONET on July 20, 2007. The item was subject to Plaintiff McDonough's $1,000 deductible. Of the $525 that was billed, Defendant Horizon allowed $350.00 and applied the $350 towards Plaintiff's deductible.   With respect to the aforesaid health services from Dr. Richard Luciani, Defendant Horizon sent, via U.S. Mail, Plaintiff McDonough an EOB that was uninformative, false and

misleading.

    (c)  On July 6, 2009, Plaintiff McDonough's husband, a beneficiary under her policy, received health services from Morristown Pathology Associates, an ONET provider. The claim was processed on July 20, 2009. Of the $535 that was billed, Defendant Horizon allowed $529 and paid a total of $317.40.   With respect to the aforesaid health services from Morristown Pathology Associates, Defendant Horizon sent, via U.S. Mail, Plaintiff McDonough an EOB that was uninformative, false and misleading.

    (d)  Also on July 6, 2009, Plaintiff McDonough's husband, received services from Dr. Elliot S. Kerven of Summit Anesthesia Associates an ONET provider in connection with this same procedure. The claim was processed on July 13, 2009.   Of the $900 that was billed, Defendant Horizon allowed $474 and Plaintiff McDonough was balance billed for $474. With respect to the aforesaid health services from Dr. Elliot S. Kerven, Defendant Horizon sent, via U.S. Mail, Plaintiff McDonough an EOB that EOB that was uninformative, false and misleading.

  26.  Upon information and belief, as to the aforesaid health services from Metropolitan Cranofacial, Dr. Richard Luciani, Morristown Pathology Associates and Summit Anesthesia Associates, Defendant Horizon's calculations of the aforesaid ONET charges were based upon the flawed, corrupted and outdated Ingenix database.

  27.  Upon information and belief, Defendant Horizon uses Ingenix data, among other sources, to understate the true market rates of medical care performed by Nonpars.   The improper use of this outdated, flawed and corrupted data has caused Plaintiff and Class Members to experience significant losses.  Plaintiff McDonough and Class Members are harmed because payors like Defendant Horizon are not reimbursing out-of-network services at appropriate levels,

which results in Nonpars increasingly billing Plaintiff McDonough and Class Members for amounts charged, which exceed the amounts Defendant Horizon covers.  Plaintiff McDonough and Class Members are harmed because Nonpars seek to collect the remaining balance from them.

28.     Defendant Horizon's EOBs are intentionally uninformative, false, and misleading regarding the use of UCR rates.  This ambiguity has resulted in the inconsistent application of UCR to deny the Nonpars lawful reimbursement.

29.     These EOBs provide insufficient information as to the methodology or source of data used in calculating the values Defendant Horizon represents as UCR rates.

30.     In addition, any appeal was futile because Defendant Horizon failed to disclose all requested relevant information that it was obligated to disclose as a fiduciary  because Plaintiff and Class Members are unaware of the scheme that results in payors like Defendant Horizon failing to pay appropriate UCR rates, and because Plaintiff and Class Members are therefore either powerless to appeal any such improper determinations or their efforts to appeal these determinations are futile.

31.     Defendant Horizon's treatment of appeals was contrary to ERISA and applicable regulations.  It did not provide a "full and fair review."  Because Defendant Horizon's appeal process violated procedural safeguards adopted in the ERISA regulations, all such appeals are "deemed exhausted" by operation of law.

32.     Defendant Horizon violated various fiduciary and statutory and common law duties to Plaintiff McDonough and Class Members by not providing them with a full and fair appeals process and the underlying data on which they purportedly relied to deny their benefits, and by failing to make decisions untainted by their self-interest.

33.     ERISA fiduciaries must ensure that the documentation provided to their members is complete and accurate regarding what benefits will be paid.  One of the required documents is a Summary Plan Description ("SPD"), which is supposed to alert members as to benefit payment for both in-network and out-of-network providers.  Federal regulations define specific minimum requirements for SPDs.

34.     As set forth herein, Defendant Horizon violated the SPD regulations in that Defendant Horizon failed to provide Plaintiff and Class Members with SPDS.  In addition, Defendant Horizon failed to set forth required information about UCR and Nonpar Pricing Methods in its SPDs.

## VI.     THE INGENIX DATABASE

### A.     Overview of The Ingenix Database

35.     Upon information and belief, at all relevant times, Defendant Horizon relied upon and utilized the Ingenix Database, known as "PHCS" and "MDR," to make UCR determinations. Ingenix, a wholly owned subsidiary of United Health Group, Inc. ("UHG"), is a self-styled nationwide "health care information company" that sells "customized fee analyzers" to medical providers, healthcare insurers and automobile liability insurance companies.  Ingenix creates "modules" or uniform pricing schedules, which provide whole dollar payment amounts for each percentile (for example, the 80th percentile) for given medical procedures in various locations. All users of the Ingenix Database are given precisely the same dollar amounts by percentile for each particular procedure and area.  As set forth herein, Ingenix data cannot accurately or properly determine UCR.

36.     In October 1998, Ingenix purchased the Prevailing Healthcare Charges System ("PHCS") database from the Health Insurance Association of America ("HIAA"), an insurance trade association.

37.     Since 1973, HIAA has produced and marketed its database primarily to insurers, such as Defendant Horizon.  HIAA obtained historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors and self-insured companies.  Additional data was added regarding dental charges (in 1977), medical charges (in 1988) and drugs/medical equipment (in 1998).  The database contained data received from more than 150 contributors located throughout the United States, including the District of Columbia, Puerto Rico and the Virgin Islands.  The PHCS became the largest pool of charges for medical services in the country and was considered to be the nation's most comprehensive database of provider charges for private health care services.

38.     The information HIAA compiled was collected from its members and insurers.  Such data, however, consisted only of four data points; namely, the date of service, the CPT code, the billed charge and the geozip.  This was the *only* information that HIAA sought from its members to create the PHCS.

39.     In fact, HIAA, acting through its committees and its Board of Directors, consciously decided to limit the amount of information it received from contributors to create the PHCS.  In its own documents, HIAA stated that the data was limited and acknowledged that even the quality of the data was "questionable."

40.     Upon information and belief, HIAA informed the data purchasers (including Defendant Horizon) that it was not endorsing, approving, or recommending the use of any of its data for any particular purpose.  In fact, HIAA released its data with a disclaimer that specifically stated in relevant part:

> The data are provided to members [*i.e.*, insurance companies such as Defendants] for informational purposes only and the HIAA disclaims any endorsement, approval or recommendation of the data.  There is neither a stated nor implied "usual and customary" charge.

41.     Despite its own disclaimer, Ingenix continues to enter into contractual agreements with Defendant Horizon and other insurance companies whereby the Ingenix Database is used to calculate UCR rates for ONET services, which turn out to be artificially low.  Indeed, UHG and Ingenix promise that Ingenix Database users, including Defendant Horizon, will achieve substantial savings, including a 16:1 return on their investment.

42.     During the Class Period, Defendant Horizon used (and continues to use) the Ingenix Database as the primary source of data upon which it bases its UCR determinations, even though Defendant Horizon knows that it cannot and should not be used for that purpose. As alleged herein, PHCS was designed to provide limited information about provider charges, and not to determine precise reimbursement amounts.

43.     Despite Defendant Horizon's awareness that the Ingenix data "does not determine R&C amounts," Defendant Horizon knowingly used Ingenix data to price UCR for its members without disclosing the Ingenix disclaimer to its Members seeking reimbursement for ONET services.

**B.     Flaws In The Ingenix Database**

44.     For the creation and continued updating of its Database, Ingenix relies entirely on accumulating data from its various information providers via its "data contribution program" in which those health insurers that are Ingenix clients submit information about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific "CPT" or "HCPCS" code services.  CPT codes are a system by which the AMA categorizes all medical services by five-digit codes.  Healthcare Common Procedure Coding System ("HCPCS") codes are monitored by the Centers for Medicare and Medicaid Services ("CMS"), and are based on the CPT system.  The data Ingenix receives has been termed a "convenience sample."

## 1.   **Ingenix Uses Inadequate Data Points**

45.      Upon information and belief, after a Nonpar provides treatment to a Member, that provider submits a standardized claims procedure form to Defendant Horizon; Defendant Horizon then extracts information from that form to submit to Ingenix.   However, upon information and belief, the only information provided from the claims form to Ingenix are the following four data points:  (a) the date of service; (b) the CPT code; (c) the zip code where the service was provided; and (d) the actual amount billed.

46.      In or around 2005, members of HIAA, discussed submitting more than these four data points to Ingenix because they recognized that the four data points were limited and inadequate as a basis for calculating accurate UCR rates.  Potential data points included provider identification, licensure, specialty, patient age and gender, and the type of facility where the service was provided.

47.      As a result, healthcare insurers continue to enter these four simple data points onto a standard claims submission form provided to Ingenix.  However, prior to submission to Ingenix, health insurers first "scrub" these claims submissions forms in order to remove the highest charges, thereby submitting only the lowest claims amounts, which results in a lower average cost.

48.      Because it only receives four data points on the data contribution forms, Ingenix necessarily uses only those four elements (date of service, CPT code, address, and amount billed) to create the Ingenix Database.  These four data points do not identify the provider, the patient (including age and condition), the type of facility where the services was performed, any adjustment factors for cost of living, the specific provider-type performing the services, the provider's usual charge and licensure, the type of facility where the service was performed (*i.e.*, hospital, clinic, doctor's office, nursing home, or intensive care unit), or the prevailing fee or

charge level for any provider or service in a particular geographic region.

49.     In fact, Ingenix actually further decreases the amount of specificity provided on the data contribution forms by removing any "modifiers" contained on those forms.  Modifiers consist of a two-digit number that providers add to a five-digit CPT code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided.

**2.      Ingenix's Flawed Use of Geo-zips**

50.     The Ingenix Database also does not tabulate data according to the specific geographic area where a UCR actually would apply.  Instead, Ingenix divides all states into "geo-zips," composed of cities and towns sharing three-digits of postal zip codes, which are then grouped together by not only geographical proximity, but also by what Ingenix arbitrarily decides are "data similarities."  These geo-zips are *not* medical service areas amenable to cost comparison.

51.     The distortions created by the use of the geo-zips are recognized by Ingenix itself. In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area.  For example, many different three digit areas contain both urban and rural locales with different charging patterns.  Use your judgment to determine how to interpret the fee range for your particular community.

52.     Defendant Horizon fails to exercise reasonable judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns."  Instead, Defendant Horizon relies strictly on the geographic groupings provided by the Ingenix Database without taking into account possible different charging patterns within each geo-zip.  By doing so, Defendant Horizon's UCR rates have no valid basis, do not comply with its plan documents, are unreasonable, and violate applicable law.

**3.**     <u>Ingenix Further "Scrubs" Data Contributed by Insurers</u>

53.      Once Ingenix receives data contribution forms from individual insurers (data which those insurers themselves have already scrubbed), it further "scrubs" the pooled data to remove high-end values but not low-end outliers so as to lower the average price of ONET benefits. Ingenix does so by using formulaic edits to identify purported statistical outliers and automatically removes them without factual basis or further investigation to determine if they are truly incorrect data points (and should be removed) or are simply valid high charges. Ingenix actually rejects data from data contributors if the claims are too high. The incorrect removal of valid high charges biases the upper percentile values downward.

54.      Based upon these procedures, Ingenix then produces two cycles of uniform pricing schedules a year that include medical, surgical, anesthesia and coding system service rates for a given geographic area and CPT code.

**4.**     <u>The Derived Data Are Flawed</u>

55.      The "conversion factor data," which is used to develop the "derived" data, as referred to in the disclaimer, are not the same as the actual charge data contributed by healthcare insurers to Ingenix.

56.      Throughout the relevant time period, derived data has been used as the basis for UCR reimbursement for the majority of medical and surgical services nationwide. Derived data are not specific to a provider, patient, or procedure (CPT code). Rather than setting out rates for healthcare services based on what providers actually charge in the marketplace, derived data uses relative values assigned to each separate medical procedure multiplied by a conversion factor. As a result, there is no relationship between the derived data and what providers actually charge for their services in the marketplace. Moreover, there is no scientific or other support for Defendant Horizon using derived data, through its reliance on the Ingenix Database, to set UCR

rates for ONET services.

57.     Derived charges do not reflect usual, customary and prevailing charges made by actual providers; rather, they are artificial prices that Defendant Horizon uses through its reliance on the Ingenix Database to understate UCR.

58.     The CPT Codes combined for derived data may represent very diverse procedures ranging from the most simple, including most of the charges, to the complex.  Among other things, for derived charges to provide a valid basis for determining reasonable compensation levels, an adjustment must be made to account for distribution and spread of the common and less common procedures.  This adjustment requires computation of standard deviations.  This computation is not performed by Ingenix.  Because Ingenix fails to consider that some CPT codes have a wider distribution of charges (*i.e.,* standard deviation) than others, the derived percentiles understate the true upper percentile values for these CPT codes.  This is a particularly significant problem because those CPT codes with a large number of observations tend to be the most common and are being grouped with less common procedures with fewer observations.

59.     Upon information and belief, there is no review procedure in place at Defendant Horizon to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database.  Instead, the uniform pricing schedules created by the Ingenix Database are relied upon to determine UCR rates, despite the fact that Ingenix actually informs insurance companies that it is not endorsing, approving, or recommending use of it to determine UCR rates.

60.     Likewise, Ingenix cannot guarantee that all claims received for a particular CPT code service at any given time have been reported, much less accurately reported, by its contributing healthcare insurers.  Nor can Ingenix ascertain if the bills that are listed constitute

the unnamed providers' usual and customary charges for the service or, instead, a discounted rate required by the agreements one or more of the providers may have had with health care insurers. While Ingenix requests that the CPT code billing data be accurate and complete, Ingenix remains "at the mercy" of its data contributors with respect to that result because there is no Ingenix mechanism to enforce or validate client certificates.

61.     Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median, or 80th percentile of actual marketplace CPT code service rates charged.

62.     The end result of this cycle of collusion is a database that produces flawed uniform pricing schedules (effectively UCR rates) that systematically result in the under-reimbursement for ONET services by Defendant Horizon.

63.     There are a number of flaws in the Ingenix Database which makes it an invalid and inappropriate basis for setting UCR rates because Ingenix:

(a)     Does not determine the numbers or types of providers in any geographical area;

(b)     Does not determine the actual types of procedures within a geographic area;

(c)     Collects charge data which is not representative of the actual number of procedures performed within a geographic area;

(d)     Does not collect sufficient provider-specific data to enable its users to determine whether the charges are from one provider, from several providers, or from only a minority of the providers in a geographic area;

(e)     Does not collect sufficient data to enable its users to determine whether the data reflects the charges of providers with any particular degree of expertise or specialization;

(f)     Fails to compare providers of the same or similar training and experience

level and, instead, combines and averages all provider charges by procedure code without separating the charges by provider type;

       (g)   Does not collect patient-specific information such as age, medical history or condition;

       (h)   Does not ascertain the most common charge for the same service or comparable service or supply;

       (i)   Does not determine the Place of Service (POS) or type of facility;

       (j)   Does not collect sufficient data to enable it or its users to determine an appropriate medical market for comparing like charges;

       (k)   Combines zip codes inappropriately;

       (l)   Uses zip codes instead of appropriate medical markets;

       (m)   Fails to compare procedures that use the same or similar resources (and other costs) to the provider but, rather, indiscriminately combines all provider charges by procedure code without regard to such factors;

       (n)   Fails to compare procedures of the same or similar complexity by, among other things, failing to record or account for CPT code modifiers;

       (o)   Does not use an appropriate statistical methodology;

       (p)   Does not properly consider charging protocols and billing practices generally accepted by the medical community or specialty groups;

       (q)   Does not properly consider medical costs in setting geographic areas;

       (r)   Lacks quality control, such as basic auditing, to ensure the validity, completeness, representativeness, and authenticity of the data submitted;

       (s)   Is subject to pre-editing by data contributors;

(t)    Reports charges that are systemically skewed downward;

(u)    Uses relative values and conversion factors to derive inappropriate UCR amounts;

(v)    Uses a methodology that does not comply with Defendant Horizon's contractual definition of UCR;

(w)    Purports to be confidential and/or proprietary, which prevents access to, and scrutiny of, the data by members or their employers; and

(x)    Fails to contain valid current data.

64.    These and other flaws render Defendant Horizon's use of Ingenix data invalid and unlawful for determining UCR.  All past UCR determinations based on Ingenix data should be overturned because they were based on a noncompliant, outdated and invalid database.

65.    By systematically and typically making UCR determinations without updated, compliant and valid data to substantiate its determinations, during the Class Periods Defendant Horizon breached its obligation to comply with its health plan contracts with Plaintiff McDonough and Class Members.

66.    As the staff report of the Senate Committee on Commerce, Science, and Transportation entitled *Underpayments to Consumers by the Health Insurance Industry* (June 24, 2009) ("Senate Report"), concluded:

> Although the insurance industry represented the Ingenix data as accurate and objective, subsequent investigations have revealed that the reliability of the Ingenix data was fatally undermined by faulty statistical methods and a fundamental conflict of interest. . . . In testimony before the Senate Commerce Committee in March 2009, UnitedHealth Company's CEO publicly expressed his regret that there was a conflict of interest inherent in his company's relationship with Ingenix. . . .

Evidence collected during private litigation and the New York Attorney General's investigation (described below) demonstrated how the less than arm's-length relationship between Ingenix and

the insurance industry led to reimbursement practices that cost American consumers billions of dollars.  Insurers that contributed charge data to Ingenix often "scrubbed" their data to remove high charges.  Ingenix then used its own statistical "scrubbing" methods to remove valid high charges from their calculations.

67.     In December 1997, as described above, Ingenix purchased the MDR database for derived data from Medicode, Inc.  Ingenix would later merge those two databases to form what has herein been referred to as the Ingenix Database.

68.     Under the terms of a 1998 transaction, HIAA and Ingenix agreed to have member companies participate on an ongoing Ingenix PHCS Advisory Committee, which would have input into what and how data were used by Ingenix.  Additionally, all HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

69.     Furthermore, accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.

70.     The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database and that Ingenix would waive all fees for HIAA members that contributed data.

71.     Ingenix, upon purchasing the PHCS, also entered into a Confidentiality Agreement mandating that it shield from disclosure the identity of entities that had or would submit information for use in the database.

72.     At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UHG agreed to become a member of HIAA.

## VII.   THE NEW YORK ATTORNEY GENERAL'S INVESTIGATION OF INGENIX

73.   In a separate investigation into the flawed Ingenix Database, the Office of the Attorney General of the State of New York concluded that "the Ingenix databases in fact under-reimburse consumers."   State of N.Y. Office of the Att'y Gen., *Health Care Report: The Consumer Reimbursement System is Code Blue* (January 13, 2009).

74.   According to the Attorney General's report, an analysis of the New York market showed that insurers that used Ingenix and other similar methods to determine UCR "systematically under-reimburse New Yorkers for doctor's office visits." *Id.*

75.   "When extrapolated across the State and the country, it is fair to say that the Ingenix databases have caused Americans to be under-reimbursed to the tune of at least hundreds of millions of dollars over the past ten years." *Id.*  Plaintiff McDonough and Class Members are, of course, the primary victims of this under-reimbursement scheme.

76.   Moreover, Plaintiff McDonough and Class Members have been harmed by the pervasive under-reimbursement scheme in that their physician–patient relationships have been disrupted.  According to the Attorney General:

> The responsible consumer reads the plan documents and sees a thicket of words. One term seems intelligible: the "usual and customary rate" of a similar physician for a similar service in a similar area.  That sounds reasonable.  The consumer makes the leap out-of-network and submits the bill to the insurer, only to be told the consumer will not be fully reimbursed because the doctor's charge exceeded the usual and customary rate.  The fog of ignorance continues, thanks to the insurer.  The physician-patient relationship is undermined, as the physician has been branded a charlatan whose bills are inflated.  No one's interests here are advanced, except perhaps when next time, the consumer decides to stay in network for fear of what bills may accrue for out-of-network care.  The interests advanced in that event are those of the insurer, whether by accident or design.

77.   In addition to the negative impact that this disparagement has had on Plaintiff McDonough and Class Members, the disruption of the patient-doctor relationship.

78.   In discussing where the blame for this under-reimbursement scheme should lie,

the Attorney General explained: "[T]he fault cannot be laid on Ingenix alone.  All industry members have benefited unfairly at the expense of consumers over the past ten years, and they continue to benefit unfairly from a rigged system day after day." *Id.*  Defendant Horizon, as a significant beneficiary of the Ingenix Database should, therefore, be held accountable for its use of the database to under-reimburse Plaintiff McDonough and Class Members.

79.    Simultaneous with the release of the NYAG's findings, UHG, the owner of the Ingenix Database, settled claims centering on the Ingenix Database and UCR reimbursements with the NYAG and the AMA, among others.  As part of the NYAG settlement, UHG agreed to pay the NYAG approximately $50 million.  These funds are earmarked for the creation of an independent non-profit organization, which will own and operate a new database to be used for UCR determinations.  This new database will be designed to take the place of the Ingenix Database.

## VIII.   THE U.S. CONGRESS INVESTIGATES THE INGENIX DATABASE

80.    The U.S. Congress also is actively investigating the use of the Ingenix Database in setting UCR amounts.   Recently, the Senate Committee on Commerce, Science, and Transportation held full committee hearings on "Deceptive Health Insurance Industry Practices – Are Consumers Getting What They Paid For?"  The Committee held two such hearings, the first on March 26 and the second on March 31, 2009, examining how the health insurance industry reimburses consumers for ONET services; specifically, how the industry calculates the UCR rates for Nonpars.

81.    During the March 31, 2009 hearing, U.S. Senator and Committee Chairman John D. Rockefeller, IV, speaking for the majority of the Senate Committee, explained why they believed the insurance industry's practices were "deceptive."  Mr. Rockefeller noted that more than 100 million Americans paid for health insurance that would give "them the option of going

outside of their provider networks for care," but that the insurance companies were not living up to their end of the bargain:

> Let's be very clear about this. The insurers aren't letting their policyholders see non-network doctors out of the goodness of their hearts. Consumers are paying for this option - through higher premiums and higher cost sharing. There are many reasons American consumers decide to pay the extra money for health insurance with an out-of-network option. One New York consumer we heard from last week, Dr. Mary Jerome, said she paid extra for the "peace of mind" that she could get the best care available when she really needed it.

> What we learned at our first hearing was that while consumers held up their side of the bargain, the insurers did not. The insurance industry promised to base their out-of-network payments on what they call the "usual, customary, and reasonable" cost of medical care in a particular area. Thanks to the New York investigation and other lawsuits, we now know that the insurance companies were not delivering what they promised.

82.     During the hearings, Senator Rockefeller specifically addressed the New York Attorney General's findings as to the insurance industry's use of the Ingenix's Database to pay far less than the UCR amounts:

> In Erie County, New York, for example, insurance companies were reimbursing their policyholders for doctor visits at rates that were 15 to 25% below the local prevailing rates. A federal judge recently concluded that the reasonable and customary data insurers used in New Jersey was 14.5% lower than the prevailing market rates. Everywhere experts have looked at this data, they have found what statisticians call a "downward skew" in the numbers. For ten years or even longer, this skewed data was used to stick consumers with billions of dollars that the insurance industry should have been paying. The source of the skewed data was Dr. Slavitt's company, Ingenix.

In light of the insurance industry's fraudulent use of the Ingenix Database in setting UCR rates, the Senate Committee is currently evaluating whether more federal oversight and regulation of the insurance industry is necessary. For now, however, the only avenue of redress for insureds and their health care providers, such as Plaintiff McDonough and Class Members is through the courts.

## IX.   CLASS ACTION ALLEGATIONS

### A.   Class Definitions

83.     Plaintiff McDonough and Class Members bring this class action on behalf of a

Class, which is defined as:

> All persons in the United States who are, or were, from February 9, 2003 through
> the date set by the Court as the outside class date, ("class period") members of
> any large or small employer health care plan insured or administered by
> Defendant Horizon subject or not subject to ERISA who received medical
> services or supplies (including hospital, ambulance, physician, mental health,
> pharmaceutical, surgery, anesthesia or any other type of medical services or
> supplies) from an out-of-network provider and received reimbursement less than
> the provider's billed charge for which Defendant Horizon (or anyone acting on
> behalf of Defendant Horizon) allowed less than the provider's billed charge.

84.     On behalf of the ERISA Class, Plaintiff McDonough and Class Members assert

claims against Defendant Horizon to recover unpaid benefits due them under the plan and to

enforce and clarify their rights under § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), as

well as the applicable regulation, 29 C.F.R. § 2560.503-1.   Plaintiff McDonough and Class

Members allege that Defendant Horizon breached its contractual obligations to pay UCR, as

defined in Defendant Horizon's health plan contracts, including by relying on a database that

cannot satisfy the contractual definition of UCR because it is outdated (as to SEHP Subscribers)

and because it is outdated, flawed and corrupted (as to ERISA and non-ERISA non-SEHP

Subscribers).   Plaintiff McDonough and Class Members allege that Defendant Horizon is a

claims fiduciary and an ERISA fiduciary, and that it has violated its fiduciary duties of loyalty

and care under §§ 404(a)(1)(B) and (D) and 406 of ERISA, inter alia, by making ONET services

reimbursement determinations using outdated, unauthorized and undisclosed rules; by failing to

provide required data and other information to Class Members, and by failing to apprise

Members of material information regarding how Defendant Horizon determined their ONET

services reimbursement amounts.   Plaintiff McDonough and Class Members also allege that

Defendant Horizon has violated specific ERISA provisions relating to appeals and SPDs and has violated claim procedure regulations.   Finally, Plaintiff McDonough alleges that Defendant Horizon has determined UCR in violation of the New Jersey SEHP Regulation because the Ingenix database is outdated..

### B.   Common Class Claims, Issues And Defenses

85.   The following common class claims, issues and defenses pertain to Plaintiff McDonough and Members of the Class:

(a)   Whether Defendant Horizon's use of Ingenix data or its other Nonpar Pricing Methods (including default formulas) to calculate UCR charges in determining Nonpar reimbursement violated ERISA, state statutory or  common law;

(b)   Whether Defendant Horizon's Nonpar benefit reductions violated ERISA, state statutory or common law;

(c)   Whether ERISA requires each Class member to prove exhaustion or futility;

(d)   Whether Class Members (including those who assigned claims) may recover benefits and the method of calculation of the reimbursement;

(e)   Whether the claim for failure to provide SPDs and other information upon request entitles Class Members to any relief;

(f)   Whether the claim for failure to provide accurate SPDs and other information upon request entitles Class Members to any relief;

(g)   Whether interest should be added to the payment of unpaid benefits under ERISA or common law;

(h)   Whether Defendant Horizon's claims review procedures complied with ERISA;

(i)   The standard of review applicable to review Defendant Horizon's adverse benefit determinations;

(j)   The identity and scope of Defendant Horizon's plans subject to this Amended Class Action Complaint;

(k)     Whether the contractual terms of the relevant plans authorize Defendant Horizon's Nonpar Pricing Methods to pay Nonpar provider claims;

(l)     Whether Defendant Horizon violated its fiduciary duties owed to its Members when it made its reimbursement decisions based on its Nonpar Pricing Methods or otherwise engaged in the conduct alleged in this Amended Class Action Complaint;

(m)     Whether Defendant Horizon's failure to properly disclose the specific reason for UCR and Nonpar Pricing Methods in its EOBs, as well as failure to disclose material information (including the offer to disclose the relevant evidence), violated ERISA, state statutory or common law;

(n)     Whether the Court's interpretation of Defendant Horizon's plans must be guided by the state regulators' interpretation of such plans;

(o)     What the applicable statute of limitations periods are for the claims of Class Members;

(p)     Whether Defendant Horizon's failure to pay interest (a) when claims were not timely paid and (b) when the UCR was increased on appeal, violated ERISA, state statutory or common law; and

(q)     Whether Defendant Horizon systematically violated the SEHP Regulation applicable to New Jersey small employer plan members by using outdated data from the Ingenix database.

(r)     Whether Defendant Horizon mislead or withheld information from the New Jersey regulators about its payment of benefits.

(s)     Whether Defendant Horizon systematically and typically fails to provide a "full and fair review" to Class Members.

(t)     Whether Defendant Horizon systematically and typically violated ERISA or federal claims procedure regulations as to Class Members.

## C.     <u>The Class Satisfies The Requirements Of Rule 23</u>

86.     The Class Members are so numerous that joinder of all Members is impracticable.

Upon information and belief, Defendant Horizon insures millions of Members nationwide

including thousands of Members in the State of New Jersey.   The precise number of Class

Members is within Defendant Horizon's custody and control.   Based on reasonable estimates, the

numerosity requirement of Rule 23 is easily satisfied for the Class.

87.     Plaintiff McDonough and the Class Members' claims are typical of the claims of the Members of any large or small employer health plan insured or administered by Defendant Horizon because, as a result of the conduct alleged herein, Defendant Horizon has breached its statutory, plan, contractual and fiduciary obligations to Plaintiff McDonough and Members of the Class through and by a uniform pattern or practices as described herein.

88.     The requirements for proving a claim for benefits under ERISA will also serve to satisfy proof for a claim for breach of contract, such that Plaintiff McDonough is an adequate and appropriate class representative for the Class.

89.     Plaintiff McDonough and Members of the Class will fairly and adequately protect the interests of the Members of the Class, are committed to the vigorous prosecution of this action, have retained counsel competent and experienced in class action litigation and have no interests antagonistic to or in conflict with those of the Class. For these reasons, Plaintiff McDonough and Members of the Class are adequate representatives of the Class.

90.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for Defendant Horizon.

91.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all members of the Class is impracticable. Further, because the unpaid benefits and damages suffered by individual members of the Class may be relatively small (although significant to each of them), the expense and burden of individual litigation make it impossible for the Class Members individually to redress the harm done to them. Given the uniform policy and practices at issue, there will also be no difficulty in

the management of this litigation as a class action.

92.     Defendant Horizon failed to comply with the terms of Plaintiff McDonough and Members of the Class' health plans by systematically and typically making UCR determinations that have underpaid benefits, in part by using outdated, noncompliant and invalid data to make adverse benefit determinations.  Defendant Horizon has also failed to comply with the terms of Plaintiff McDonough and Members of the Class' health plans by systematically and typically reducing reimbursement for multiple procedures and procedures by assistant surgeons and co-surgeons, when such reductions are not authorized or adequately disclosed in its health plan contracts with members.

## XII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Breach Of Plan Provisions For Benefits
In Violation of ERISA § 502(A)(1)(B)
(On Behalf of Plaintiff McDonough and Members of the Class with ERISA Health Plans)**

93.     The allegations in this Amended Class Action Complaint are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Members of the Class with ERISA health plans.

94.     During the Class Period, Defendant Horizon breached its plan provisions for benefits by underpaying UCR and other ONET reimbursement amounts in ERISA health care plans to Plaintiff McDonough and Members of the Class with ERISA health plans in violation of § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B)

95.     As alleged herein Defendant Horizon's breaches included use of the Ingenix Database and other Nonpar Pricing Methods to both calculate UCR and reduce other benefits for out-of-network medical services.

96.     Under the terms of the health plans of Plaintiff McDonough and Members of the

Class with ERISA health plans, Defendant Horizon administers benefits and is a fiduciary.

97.    Where Defendant Horizon acts as a fiduciary or performs discretionary benefit determinations or otherwise exercises discretion, or determines final benefit appeals, Defendant Horizon is liable for underpaid benefits to Plaintiff McDonough and Members of the Class with ERISA health plans.

98.    Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff McDonough and Members of the Class with ERISA health plans are entitled to recovery for unpaid benefits and declaratory relief relating to Defendant Horizon's violation of the terms of its health care plans.

## SECOND CLAIM FOR RELIEF

### For Declaratory Relief Relating
### To Defendant Horizon's Violation of ERISA
### (On Behalf of Plaintiff McDonough and Members of the Class with ERISA Health Plans)

99.    The allegations in this Amended Class Action Complaint are realleged and incorporated by reference as if fully set forth herein.   This claim is brought by Plaintiff McDonough and Members of the Class with ERISA health plans.

100.    Under federal law, Plaintiff McDonough and Members of the Class with ERISA health plans are entitled to receive protections under ERISA with respect to the implementation of their group health care plans, including (a) a "full and fair review" of all claims denied by Defendant Horizon; (b) compliance by Defendant Horizon with ERISA claims procedure regulations; and (c) receipt of accurate materials summarizing such group health plans, known as SPDs under §102 of ERISA, 29 U.S.C. § 1022.

101.    Any time Defendant Horizon deprived members of "full and fair review" or proper compliance with ERISA claims procedure regulations, it violated § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3).

102.    Although Defendant Horizon was obligated to do so, it failed to provide a "full

and fair review" of denied claims pursuant to § 503 of ERISA, 29 U.S.C. § 1133, and its implementing regulations, *inter alia*, by failing to disclose the "specific reasons" for benefit denials, failing to disclose data and/or the methodology used to determine UCR or Nonpar provider reimbursement, and failing to comply with appeal procedures imposed by ERISA and the federal common law.

103.    Applicable federal claims procedure regulations set forth minimum standards for claim procedures, appeals, notice to members and the like.  By engaging in the conduct described herein including, but not limited to, making benefit determinations for Nonpar provider claims that are inconsistent with the terms of group health plans, by failing to give required notice to members, and failing to disclose data and/or methodology it used to determine UCR or other Nonpar reimbursements, Defendant Horizon failed to comply with such regulations

104.    The consequences of Defendant Horizon's failure to comply with the regulations (as well as federal common law), are that Defendant Horizon failed to provide reasonable claims procedures and failed to make required disclosures to Plaintiff McDonough and Members of the Class.

105.    Members' administrative remedies are deemed exhausted, *inter alia*, by virtue of the invalid Ingenix Database, other invalid Nonpar Pricing Methods, and Defendant Horizon's failure to provide reasonable claims procedures.  By virtue of the conduct alleged in this Amended Class Action Complaint, any appeal would have been futile.

106.    Defendant Horizon's failure to supply accurate SPDs and accurate information is redressable under § 502(c) of ERISA, 29 U.S.C. § 1132(c).

107.    Specifically, Defendant Horizon failed to supply any SPDs to Plaintiff McDonough in 2005, 2006, 2007, 2008 and 2009.

108.    Defendant Horizon's failure to disclose material information about its UCR and other Nonpar Pricing Methods is a violation federal common law, which obligates fiduciaries such as Defendant Horizon to provide material information to members.

109.    Plaintiff McDonough and Members of the Class with ERISA health plans have been harmed by Defendant Horizon's failure to provide a "full and fair review" of appeals submitted by them under § 503 of ERISA, 29 U.S.C. § 1133, by Defendant Horizon's failure to disclose information relevant to appeals or to comply with ERISA claims procedure regulations, in violation of ERISA and the federal common law, and by Defendant Horizon's failure to provide accurate information, in violation of federal common law and § 102 of ERISA, 29 U.S.C. § 1022.  Plaintiff McDonough and Members of the Class are entitled to a declaration by this Court that Defendant Horizon's actions as alleged herein are in violation of its duties and obligations.

### THIRD CLAIM FOR RELIEF

**Violation of Fiduciary Duties of Loyalty and
Due Care In Violation of § 404 of ERISA
(On Behalf of Plaintiff McDonough and Members of the Class
with ERISA Health Plans)**

110.    The allegations in this Amended Class Action Complaint are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Members of the Class with ERISA health plans.

111.    During the Class Period, Defendant Horizon acted and continues to act as a fiduciary to Plaintiff McDonough and Members of the Class with ERISA health plans in connection with their health plans, as the term fiduciary is interpreted under § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A).

112.    As a functional fiduciary under ERISA and as a claims fiduciary making final

appeal decisions for self-insured plan members, Defendant Horizon owes its Members in such plans a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. Further, fiduciaries must ensure that they are acting in accordance with the documents and instruments governing the plan, in accordance with § 404(a)(1)(B) and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(B) and (D).   In failing to act prudently, and in failing to act in accordance with the documents governing the plan, Defendant Horizon violated its fiduciary duty of care.

113.   As a fiduciary of health plans under ERISA, Defendant Horizon owed its Members a duty of loyalty, defined as an obligation to make decisions in the interest of its Members, and to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of members, in accordance with § 406 of ERISA, 29 U.S.C. § 1106.   Thus, Defendant Horizon cannot make benefit determinations for the purpose of saving money at the expense of its Members.

114.   During the Class Period, Defendant Horizon violated its fiduciary duty of loyalty by using Ingenix that benefited itself at the expense of the Class with ERISA health plans.   In addition, Defendant Horizon violated (and continues to violate) its fiduciary duty of loyalty by failing to inform its Members of material information, including but not limited to flaws in the Ingenix Database that preclude its appropriate use to determine UCR reimbursement.

115.   In relying on the Ingenix Database or other Nonpar Pricing Methods, which are noncompliant with its contractual obligations and invalid to make UCR determinations, Defendant Horizon violated its fiduciary obligations to Plaintiff McDonough and Members of the Class with ERISA health plans.

116.   Plaintiff McDonough and Members of the Class with ERISA health plans are

entitled to assert a claim for relief for Defendant Horizon's violation of its fiduciary duties under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), including and declaratory relief, and may seek removal of any fiduciary that breached its duties.

## FOURTH CLAIM FOR RELIEF

### Failure To Provide Full And Fair Review
### (On Behalf of Plaintiffs with ERISA Health Plans)

117.    The allegations contained above are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Class Members with ERISA health plans.

118.    Defendant Horizon took upon itself the role of determining appeals and grievances within the meaning of such terms under ERISA.  Plaintiff McDonough and Class Members with ERISA health plans are entitled to receive a "full and fair review" of all claims denied by Defendant Horizon, and they are entitled to assert a claim under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Defendant Horizon's failure to comply with these requirements.

119.    Although Defendant Horizon was obligated to do so, it failed to provide a "full and fair review" of denied claims pursuant to ERISA § 503, 29 U.S.C. § 1133 (and the regulations promulgated thereunder) for Plaintiff McDonough and Class Members with ERISA health plans, *inter alia*, by failing to disclose the "specific reasons" for benefit denials, failing to disclose data and/or the methodology it relied on in determining UCR, and failing to comply with appeal procedures imposed by ERISA and the federal common law.

120.    Plaintiff McDonough and Class Members with ERISA health plans have been harmed by Defendant Horizon's failure to provide a "full and fair review" of appeals submitted by them under ERISA § 503, 29 U.S.C. § 1133, and by Defendant Horizon's failure to disclose

information relevant to Class Members' and providers' appeals in violation of ERISA and federal common law.

## FIFTH CLAIM FOR RELIEF

### Defendant Horizon's Failure To Comply With Federal Claims Regulations
### (On Behalf of Plaintiffs with ERISA Health Plans)

121.    The allegations contained above are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Class Members with ERISA health plans.

122.    Defendant Horizon functions as an insurance company administrator within the meaning of such terms under ERISA claims procedure regulations.  Defendant Horizon must comply with all such ERISA claims procedure regulations in denying any benefit to Plaintiff McDonough and Class Members with ERISA health plans.   Plaintiff McDonough Class Members with ERISA health plans are entitled to assert a claim under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for a failure to comply with these requirements by Defendant Horizon.

123.    The claims procedure regulations set forth minimum standards for claim procedures, appeals, notice to Members, and the like.  In engaging in the conduct described herein, including but not limited to, making ONET determinations that are inconsistent with the terms of group health plans, by failing to give required notice to Members, and failing to disclose data and/or methodology they used to determine UCR or other out-of-network reimbursements, Defendant Horizon failed to comply with such regulations

124.    The consequences of Defendant Horizon's failure to comply with the regulations (as well as federal common law), are that Defendant Horizon failed to provide reasonable claims procedures, and failed to make required disclosures.

125.    Members' administrative remedies are deemed exhausted *inter alia* by virtue of

the outdated, invalid database and Defendant Horizon's failure to provide reasonable claims procedures.  Any appeal would have been futile.

### SIXTH CLAIM FOR RELIEF

**Failure To Provide An Accurate SPD And Required Disclosure**
**(On Behalf of Plaintiffs with ERISA Health Plans)**

126.    The allegations contained above are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Class Members with ERISA health plans.

127.    Defendant Horizon's disclosure obligations under ERISA, include furnishing accurate materials summarizing such group health plans, known as Summary Plan Description ("SPD") materials  under ERISA § 102, 29 U.S.C. § 1022; supplying information requested by Members or their assignees, such as Plaintiff McDonough and Class Members with ERISA health plans under ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).

128.    Defendant Horizon's failure to supply accurate SPDs and accurate information is redressable under ERISA § 502(c), 29 U.S.C. § 1132(c).

129.    Defendant Horizon's failure to disclose material information about its UCR and other out-of-network reimbursement determinations violates federal common law, which obligates fiduciaries such as Defendant Horizon to provide such information to Members and their assignees.

130.    Plaintiff McDonough and Class Members with ERISA health plans have been proximately harmed by Defendant Horizon's failure to provide accurate information violates the federal common law and with ERISA § 102, 29 U.S.C. § 1022 and with ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4).

## SEVENTH CLAIM FOR RELIEF

**Violation Of New Jersey Regulation For Small Plan Members**
**(On Behalf of Plaintiff McDonough and Class Members with SEHP Plans)**

131.    The allegations contained above are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Class Members with New Jersey SEHP Plans.

132.    Plaintiff McDonough's benefits were determined under a Horizon small employer health plan in New Jersey. SEHP plans are governed by ERISA and are also subject to a New Jersey SEHP regulation governing health plans with 50 or fewer Members.  Defendant Horizon must comply with New Jersey law and regulations for its Members and their assignees in New Jersey,  including but not limited to N.J.A.C. § 11:21-7.13(a) (the "SEHP Regulation"). The New Jersey SEHP Regulation imposes additional requirements beyond those required under ERISA. New Jersey adopted the SEHP Regulation in an effort to ensure that all Members of small employer plans, who were not in a position to negotiate the best benefit packages from insurers, would receive a minimum level of benefits.

133.    Under the SEHP Regulation, Defendant Horizon must pay ONET hospital services based on actual charges, and must pay ONET medical services using the 80th percentile of the Ingenix database updated within 60 days. In incorporating the Ingenix database into the New Jersey SEHP Regulation, the New Jersey Regulators were not told of the inherent flaws and inadequacies of the Ingenix database.

134.    Defendant Horizon cannot make reductions based on multiple surgery, assistant surgeons, or co-surgeons for Class Members with New Jersey SEHP Plans.

135.    Defendant Horizon's UCR and other ONET reimbursement determinations to Plaintiff McDonough and other Class Members with New Jersey SEHP Plans violated the SEHP

Regulation because Defendant Horizon failed to update the Ingenix database.

136.     Upon information and belief, Defendant Horizon failed to pay ONET medical services using the 80th percentile of the Ingenix database.

137.     Upon information and belief, Defendant Horizon failed to update its database in a timely way as required by the regulation.

138.     Plaintiff McDonough, individually and on behalf of other Class Members with New Jersey SEHP Plans, is entitled to unpaid benefits where Defendant Horizon's payments were in derogation of either their Contracts of Insurance or the SEHP Regulation, or both.

## EIGHTH CLAIM FOR RELEIF

### Violation of Contract
### (On Behalf of Class members with Non-ERISA Health Plans)

139.     The allegations contained above are realleged and incorporated by reference as if fully set forth herein.  This claim is brought by Plaintiff McDonough and Class Members with non-ERISA health plans.

140.     During the Class Period, Defendant Horizon breached the provision of the non-ERISA health plans of Class Members by underpaying UCR and other ONET reimbursement amounts by using the outdated, flawed and corrupted Ingenix database.

141.     These wrongful acts constitute a breach of contract, a breach of the non-ERISA health plans of Class Members.

142.     As a result of this breach of contract, Class Members non-ERISA health plans have incurred monetary damage.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial for all claims so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff McDonough and the Subscriber Class and Class Members demand judgment in their favor against Defendant Horizon as follows:

A.      Declaring that Defendant Horizon has breached the terms of Plaintiff's health plan and the terms of the ERISA health plans of Class Members, and awarding damages for breach of contract and unpaid benefits as well as awarding declaratory relief with respect to Defendant Horizon's violations of ERISA;

B.      Declaring that Defendant Horizon has failed to provide a "full and fair review" to  Plaintiff McDonough and Class Members with ERISA health plans under § 503 of ERISA, 29 U.S.C. § 1133, and awarding declaratory relief with respect to Defendant Horizon's violation of ERISA;

C.      Declaring that Defendant Horizon has violated its disclosure obligations under ERISA and the federal common law, including under § 104(b)(4) of ERISA, 29 U.S.C. § 1024(b)(4), and § 102 of ERISA, 29 U.S.C. § 1022, for which Plaintiff McDonough and Class Members with ERISA health plans are entitled to declaratory relief;

D.      Declaring that Defendant Horizon violated its fiduciary duties of loyalty and care to Plaintiff McDonough and Class Members with ERISA health plans for which it may be removed as a fiduciary;

E.      Declaring that Defendant Horizon violated federal claims procedures and SPD disclosure requirements under ERISA;

F.     Awarding Plaintiffs and Class Members the costs and disbursements of this action, including reasonable counsel fees, costs and expenses in amounts to be determined by the Court;

G.     Awarding Plaintiff McDonough and Class Members with SEHP plans unpaid benefits in all instances where Defendant Horizon failed to comply with the New Jersey SEHP Regulation, and declaratory, injunctive and equitable relief to ensure past and future compliance with New Jersey law;

H.     Awarding Plaintiff McDonough and Class Members with non-ERISA health plans unpaid benefits for underpayment of UCR and other ONET charges.

I.     Awarding prejudgment interest; and

J.     Granting such other and further relief as is just and proper.

NAGEL RICE, LLP
103 Eisenhower Parkway
Roseland, NJ 07068
(973) 618-0400

By: *Bruce H. Nagel*
Bruce H. Nagel, Esq.
Attorneys for Plaintiff

Dated:  November 6, 2009