UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

CATHLEEN McDONOUGH, et al,

     Plaintiffs,

vs.

HORIZON BLUE CROSS BLUE SHIELD
OF NEW JERSEY, INC.

     Defendant.

CIVIL ACTION NO.: 09-00571 (SRC)

---

**PLAINTIFF CATHLEEN MCDONOUGH'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF DEFENDANT HORIZON AND IN SUPPORT OF MCDONOUGH'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

NAGEL RICE, LLP
103 Eisenhower Parkway
Suite 103
Roseland, New Jersey 07068
(973) 618-0400
Attorneys for Plaintiffs

Bruce H. Nagel, Esq.
Of Counsel and On the Brief

Randee M. Matloff, Esq.
On the Brief

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES.........................................ii

PREFATORY STATEMENT .......................................1

STATEMENT OF FACTS ...................................... 4

ARGUMENT

    POINT I.
    THE STATE REGULATIONS RELIED UPON BY HORIZON ARE
    INAPPLICABLE AND DO NOT SHIELD HORIZON FROM
    LIABILITY BECAUSE THIS IS AN ERISA ACTION. . . . . . . 16

    POINT II.
    HORIZON'S MOTION MUST BE DENIED SINCE THERE ARE NO
    FACTSIN THE RECORD WHICH SUPPORT COMPLIANCE WITH THE
    PLAN'S UCR DEFINITION. . . . . . . . . . . . . . . . . .23

    POINT III.
    SUMMARY JUDGMENT MUST BE DENIED WITH RESPECT TO
    MCDONOUGH'S BREACH OF FIDUCIARY DUTY CLAIMS . . . . . . .26

    POINT IV.
    BECAUSE IT IS UNDISPUTED THAT HORIZON FAILED TO
    PAY MCDONOUGH "AN AMOUNT WHICH IS THE MOST OFTEN
    CHARGED FOR A GIVEN SERVICE BY A PROVIDER WITHIN
    THE SAME GEOGRAPHIC AREA" WHEN REIMBURSING FOR ONET
    SERVICES MCDONOUGH IS ENTITLED TO SUMMARY JUDGMENT. . . 31

CONCLUSION...............................................34

## TABLE OF AUTHORITIES

<u>Cases</u>

<u>Aetna Health Inc. v. Davila</u>,
  542 U.S. 200 (2004) ............................................. 16

<u>Anderson v. Liberty Lobby</u>,
  477 U.S. 242 (1986) ......................................... 26

<u>Aponte-Correa v. Allstate Ins. Co.</u>,
  162 N.J. 318, 744 A.2d 175 (2000) ........................... 21

<u>Bill Gray Enters., Inc. Employee Health & Welfare
  Plan v. Gourley</u>, 248 F.3d 206 (3d Cir. 2001) ................ 23

<u>Buczek v. Cont'l Cas. Ins. Co.</u>,
  378 F.3d 284 (3d Cir. 2004) .................................. 32

<u>Bussian v. RJR Nabisco, Inc.</u>,
  223 F.3d 286 (5th Cir. 2000) ................................. 29

<u>Celotex Corp. v. Catrett</u>,
  477 U.S. 317, 106 S. Ct. 2548 (1986) ........................ 26

<u>Cincinnati Ins. Co. v. Cham's Jewelry Art, Inc.</u>,
  31 F. App'x 793 (3d Cir. 2002) .............................. 32

<u>Colliers Lanard & Axilbund v. Lloyds of London</u>,
  458 F.3d 231 (3d Cir. 2006) .................................. 31

<u>DeVito v. Aetna</u>,
  536 F. Supp. 2d 523 (D.N.J. 2008) ........................... 16

<u>Dewitt v. Penn-Del Directory Corp.</u>,
  106 F.3d 514 (3d Cir. 1997) ................................. 32

<u>Firestone Tire & Rubber Co. v. Bruch</u>,
  489 U.S. 101 (1989) ......................................... 23

<u>Fleisher v. Standard Ins. Co.</u>,
  679 F.3d 116 (3d Cir. 2012) ................................. 23

Franco v. Connecticut General Life Ins. Co.,
  818 F. Supp. 2d 792 (D.N.J. 2011) ......................... 3, 16

Hutchinson v. Proxmire,
  443 U.S. 111 (1979) .......................................... 26

In re Freshwater Wetlands General Permit Number 16,
  379 N.J. Super. 331, 878 A.2d 22 (App. Div. 2005) ............ 22

Johnson v. Radian Group, Inc.
  2009 WL 2137241  (July 16, 2009, E.D. Pa. 2009) .............. 30

Martin v. Feilen,
  965 F.2d 660 (8th Cir. 1992), ............................... 30

McCoy v. Health Net, Inc.,
  569 F. Supp. 2d 448 (D.N.J. 2008) ........................... 33

McDonough v. Horizon Blue Cross Blue Shield of New
  Jersey, Inc., CIV.A. 09-571 SRC, 2011 WL 4455994
  (D.N.J. Sept. 23, 2011) ........................... 2, 17, 18, 27

McGee v. Equicor-Equitable HCA Corp.,
  953 F.2d 1192 (10th Cir.1992) ............................... 32

Michael Davekos, P.C. v. Liberty Mut. Ins. Co.,
  2008 Mass. App. Div. 32 ..................................... 33

N.E. Physical Therapy Plus Inc., v. Liberty Mut. Ins. Co.,
  2011 Mass. App. Div. 135 (Jan. 24, 2008) .................... 33

NAV-ITS, Inc. v. Selective Ins. Co. of Am.,
  183 N.J. 110, 869 A.2d 929 (2005) .......................... 31

Orvosh v. Program of Group Ins. for Salaried Emps.
  of Volkswagen of Am., 222 F.3d 123 (3d Cir. 2000) ........... 32

Pilot Life Ins. Co. v. Dedeaux,
  481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987) ........ 16, 17

Reich v. Compton,
  57 F.3d 270 (3d Cir.1995) ...................... 27, 28, 29, 30

Saltzman v. Indep. Blue Cross,
  384 Fed. App'x 107  (3d Cir. 2010) ...................... 23, 25

Shrewsbery v. Nat'l Grange Mutual Ins. Co.,
  395 S.E. 2d 745 (W. Va. 1990) ................................. 30

State v. Butler,
  89 N.J. 220, 445 A.2d 399 (1982) ............................. 21

State v. Thomas,
  166 N.J. 560, 767 A.2d 459 (2001) ........................... 21

Thomsen v. Mercer-Charles,
  187 N.J. 197, 901 A.2d 303 (2006) ........................... 20

Twp. of Pennsauken v. Schad,
  160 N.J. 156, 733 A.2d 1159 (1999) .......................... 21

U.S. ex rel. Catekin v. Univ. of Pittsburgh,
  192 F.3d 402 (3d Cir. 1999) ................................. 26

Venuti v. Cape May County Constr. Bd. of Appeals,
  231 N.J.Super. 546, 555 A.2d 1175 (App.Div.1989) ............ 22

**Statutes**

29 U.S.C. § 1104(a)(1)(A) ..................................... 27
29 U.S.C. § 1144(a) ...................................... 16, 17
W. Va. Code § 33-6A-4 ........................................ 31

**Regulations**

N.J.A.C. 11:21-7.13 ................................... 5, 7, 20

## PREFATORY STATEMENT

This brief[1] is submitted on behalf of Plaintiff, Cathleen McDonough ("Ms. McDonough") in opposition to the motion for summary judgment filed on behalf of Defendant, Horizon Healthcare Services, Inc., d/b/a Horizon Blue Cross Blue Shield of New Jersey, Inc. ("Horizon") and in support of Ms. McDonough's cross-motion for partial summary judgment.

We submit that Horizon's motion must be denied as the insurance regulations are inapplicable as a matter of law, and are not dispositive of the issue even if applicable in an ERISA action. In an ERISA context, the Courts have marginalized the impact which state statutes and regulations have on a claim for benefits. In this very case, and in the companion Cigna action, this Court has already rejected the carriers' argument that the DOBI regulations insulate them from UCR claims arising in the small employer plans:

> The regulation cited by Horizon in fact provides that ONET benefit payments may be based *either* on "allowed" charges for a service (referring to what plans, such as McDonough's, typically define as the "reasonable and customary" charges) *or* the provider's actual charge. *Id.* The regulation also provides that this "allowed" charge, or UCR, is to be determined according to fee

---

[1] The supporting Certification of Bruce H. Nagel and Counterstatement of Material Facts in Opposition to Defendant's motion for summary judgment/Statement of Material Facts in support of plaintiff's cross-motion for partial summary judgment is submitted herewith.

schedules provided by Ingenix and specifies that "the maximum allowed charge shall be based on the 80th percentile" of the Ingenix curve or range of prevailing fee information. *Id.* Though the regulation authorizes use of Ingenix, the Court nevertheless finds Horizon's argument unpersuasive.

McDonough's health benefits plan entitled her to ONET benefits based on the "reasonable and customary charges" for the service obtained. The plan assured that the standard of "reasonable and customary" would reflect "an amount which is most often charged for a given service by a Provider within the same geographic area." (Am.Compl., ¶ 21.) McDonough alleges that she was under-reimbursed for several ONET services because Horizon used a flawed database to determine the "reasonable and customary charges" for the services—a standard that Plaintiff alleges Horizon did not meet when it used a database it knew could not generate accurate UCR information and thus could not comply with the plan definition of "reasonable and customary." The Amended Complaint alleges, indeed, that Horizon participated in creating the flaws in the Ingenix database. Assuming the facts of the Complaint to be true, Horizon did not fulfill its plan obligation with regard to ONET coverage as to four specifically identified ONET claims made pursuant to McDonough's Horizon plan. The cited SEHP regulation may not be used by Horizon as a shield, particularly in light of its own alleged involvement in the corruption of the Ingenix database and the available option, under the very same regulation, of calculating the ONET benefit using the provider's actual charge.

McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc., CIV.A. 09-571 SRC, 2011 WL 4455994 (D.N.J. Sept. 23, 2011). See

2

also  Franco v. Connecticut General Life Ins. Co., 818 F. Supp. 2d 792, 820 (D.N.J. 2011)(While the plan permitted the use of Ingenix to determine prevailing fees, the crux of this action is that the Ingenix database could not, and did not, generate accurate prevailing fee information. The CAC alleges, indeed, that CIGNA participated in creating the flaws in the database. Chazen's theory of breach, in other words, is that CIGNA did not fulfill its obligation to pay his ONET claim based on the "Maximum Reimbursable Charge," as defined by the plan, because it knowingly used a flawed database.)

In addition, McDonough's breach of fiduciary duty claim, which Horizon conveniently ignores in its brief, implicates subjective states of mind which cannot be resolved through summary judgment. There is substantial evidence that Horizon is aware that Ingenix was a highly flawed database which it continued to use for its own economic gain to the detriment of Plan beneficiaries specifically to preclude or limit the exercise of the right to receive treatment from ONET physicians and facilities.

However, what is not disputed in this action is the fact that Ingenix is not a valid method of determining UCR and does not satisfy the definition of UCR set forth in many of the Horizon policies, including the McDonough's Plan. In essence, the plans in issue define UCR as the most often charged amount

3

in a geographic area. Not only did our expert and Ingenix representatives testify that the Ingenix database could not provide this "most often charged amount" Horizon's own experts also <u>admitted</u> that Ingenix could not determine this amount either. <u>See</u> Nagel Cert. Ex.1; Abernathy dep. II at 120-122) Hence, partial summary judgment in favor of Ms. McDonough and against Horizon on liability is appropriate at this juncture.

<u>STATEMENT OF FACTS</u>

Since 2005, Ms. McDonough has been a beneficiary in an ERISA plan for New Jersey Small Employers which contains policy provisions providing for ONET, or out of network benefits. Members pay increased premiums to obtain policies providing for ONET benefits. (Nagel Cert. Ex. 2, Slater Dep. I, 154:5-12) McDonough's plan also covers other family members, including her husband Thomas McDonough and her minor son, John McDonough. Over the course of the class period, McDonough submitted approximately 20 claims for reimbursement for ONET services. Horizon now contends that these claims were all processed using the Ingenix data. (Nagel Cert. Ex.3 and 4, Abernathy Dep. I at 43:3-13; Abernathy Report dated Sept. 16, 2011) However, in opposing class certification, Mr. Abernathy noted that for many of these claims, Horizon paid them at charges. (Nagel Cert. Ex.3, Abernathy Dep at p. 35)

Ms. McDonough' policy provided for reimbursement for ONET

4

charges based on a "reasonable and customary" charge standard, which is defined as follows:

Reasonably and Customary means an amount that is not more than the lesser of:

- the usual or customary charge for the service or supply as determined by Horizon BCBSNJ, based on a standard approved by the Board; or
- the negotiated fee schedule.

The Board will decide a standard for what is Reasonable and Customary under this Policy. <u>The chosen standard is an amount which is most often charged for a given service by a Provider within the same geographic area.</u> For charges that are not determined by a negotiated fee schedule, the Covered Person may be billed for the difference between the Reasonable and Customary charge and the charge billed by the Provider. (See Ex. 4-8 of David Jay Cert.)(emphasis supplied)

The regulation, N.J.A.C. 11:21-7.13, which Horizon contends was the basis for this plan language provided:

(a) In paying benefits for covered services under the terms of the small employer health benefits plans provided by health care providers not subject to capitated or negotiated fee arrangements, small employer carriers shall pay covered charges for medical services, <u>on a reasonable and customary basis or actual charges</u>, and, for hospital services, based on actual charges. Reasonable and customary means a standard based on the Prevailing healthcare Charges System profile for New Jersey or other state when services or supplies are provided in such state, incorporated herein by reference published and available from the Ingenix, Inc., 12125 Technology Drive, Eden prairie, Minnesota 55344.

   1. The maximum allowable charge shall be based on the 80th percentile of the profile.

> 2. Carriers shall use the profile effective as of July 1993, and shall update their databases within 60 days after receipt of periodic updates released by the Prevailing Healthcare charges System. (emphasis supplied)

This "most often charged" language included in Ms. McDonough's plan is, according to Horizon, the language contained in <u>all</u> Small Employer Health Plans. Similar language is also contained in all individual plans, and is included in <u>many</u> large employer plans as well. (Nagel Cert. Ex. 5, Pignatelli I at 12:2-9, 24:16-19)

Horizon's expert, Mark Abernathy testified that Horizon used the Ingenix database for certain large group plans (Nagel Cert. Ex. 4, Abernathy I, 83:10-23). Horizon does not and cannot contend that DOBI requires that Ingenix must be used for large employer plans. Similarly, even in the Handbook provided to Members covered under the State Health Benefits Program, which is an ASO Plan, Reasonable and Customary Allowances for ONET services is defined as follows:

> NJ DIRECT covers only reasonable and customary allowances, which are determined by the Prevailing Healthcare Charges system (PHCS) fee schedule. <u>This schedule is based on actual charges by physicians in a specific geographic area for a specific service.</u> . . " (Nagel Cert. Ex. 6, Horizon 56663) (emphasis supplied)

Consequently, while Horizon contends that this language was essentially foisted upon them by the Small Employer Health Plan

6

Board, this language is common to many other types of policies the Board does not supervise.

The Small Employer Health Plan Board amended its regulation, N.J.A.C. 11:21-7.13 effective December 21, 2009 to provide as follows:

> (a) Except as stated in (b) below for prosthetic and orthotic appliances, in paying benefits for covered services under the terms of the small employer health benefits plans provided by health care providers not subject to capitated or negotiated fee arrangements, small employer carriers shall pay covered charges for services, using either the allowed charges or actual charges. Allowed charge means a standard based on the Prevailing Healthcare Charges System profile for New Jersey or other state when services or supplies are provided in such state, incorporated herein by reference published and available from the Ingenix, Inc., 12125 Technology Drive, Eden Prairie, Minnesota 55344.
> 1. The maximum allowed charge shall be based on the 80th percentile of the profile.
> 2. Carriers shall use the profile effective as of July 1993, and shall update their databases within 60 days after receipt of periodic updates released by the Prevailing Healthcare Charges Systems.
> (b) In paying benefits for prosthetic and orthotic appliances as required by P.L. 2007, c. 345, reimbursement shall be at the same rate as reimbursement for such appliances under the Federal Medicare reimbursement schedule, whether the benefits are provided on a network or out-of-network basis. However, if the carrier's contract rate with a network provider of orthotic and prosthetic appliances exceeds the Medicare reimbursement rate, the carrier's contract rate should be paid. (emphasis supplied)

Horizon contends that it modified its SEHP language, including McDonough's policy, by replacing the term "Reasonable and Customary" with the term "allowed charge" and eliminated the

7

"chosen standard" language sometime after the regulation was altered.[2]

Plaintiff's experts, Sally Reaves and Bernard Siskin, have outlined the numerous flaws in the use of Ingenix to process ONET claims. (Nagel Cert. Ex. 7 and Ex. 8) Both have opined that the Ingenix database does not fix the amount most often charged by geographic area and violates the UCR definition in many of the Plans. (See Nagel Cert. Ex. 8, Siskin Sept. 16, 2011 Report at p. 10-11) No Horizon expert, nor any Horizon representative has ever testified or certified that the UCR payment conformed with the "most often charged" standard in the policies. Horizon's expert, Mark Abernathy also testified in deposition that he did not make an independent determination as to the validity and reliability of the Ingenix database. (Nagel Cert. Ex. 4, Abernathy I, 49:7-10; 51:7-12) Mr. Abernathy admitted in deposition that the Ingenix database is not a statistical sample and is contributed data. (Nagel Cert. Ex. 1, Abernathy II, 113-114) He further conceded that does not know one way or the other whether the Ingenix database can determine what the most often charged amount is in a given geographic area for a given service. (Nagel Cert. Ex. 1, Abernathy II at 121:4-25) Horizon's

_____

[2] Neither Ms. McDonough nor Horizon have been able to locate the 2010 Policy but the Policy effective March 1, 2011 (several years after this litigation was commenced) contains the modified language.

other expert, Stefan Boedeker, testified that he did not look at the Ingenix database to draw conclusions as to its reliability or validity from a statistical point of view and has no conclusions regarding the statistical validity of the Ingenix database. (Nagel Cert. Ex. 9, Boedeker I, 52:4-14)

Ingenix's own documents and witnesses confirm that Ingenix is *not* a valid method for determining UCR.[3] In 2004, Ingenix's internal experts, including (1) Ingenix's Rule 30(b)(6) designee, Carla Gee ("Gee"); (2) Senior Director and regulatory representative Susan Scare ("Scare"); and (3) Ingenix's expert statistician, Melvin Ott, Ph.D. ("Dr. Ott"), conducted an in-depth study of the Ingenix database. They found that Ingenix data could *not* be used to "infer a population" of providers (*i.e.,* the charge of "most providers" or "all providers") in a geographic area because it does not capture "the total population [or] percentage of providers [that] are represented by the charge data and is not "representative" of the "provider charges data."

These defects resulted in the Ingenix database being incapable of determining the "charge of most providers" in a

---

[3] Pursuant to Judge Hochberg's June 15, 2009 Case Management Order No. 1 entered in MDL No 2020 "All discovery conducted in *Cooper v. Aetna Health, Inc. PA,* Case. No. 2:07-cv-3541 ("Cooper") shall be deemed as if taken in all of the cases consolidated pursuant to this Order." McDonough is one of the consolidated cases, see Exhibit 2 to that Order.

9

geographical area for *any* medical service. Ingenix's internal experts documented major flaws in the Ingenix Database, including:

> "Data is biased because no random sampling occurred" No control of data and how contributors gather it ¯ *Data is not representative of any denominator such as the total number of doctors, payers, dollars billed/paid, etc.*" "Names. specialties and other demographic information regarding providers is not captured (can't identify individual physicians)" "Products may not meet customer's current policy language, *e.g.,* UHC"

(Nagel Cert. Ex. 10, INGENIXMDL001183971-72.)

Ingenix's witnesses, Seare and Gee, acknowledge that the Ingenix Database cannot "infer a population to determine the charge of "most providers" because "it is contributed data." Seare testified as to the limitations of Ingenix data:

> For something generally to be statistics, that means you have to be able to infer a population or you've got a random sample that tells you - - that you can draw inferences from. This is not - - *the date in our database is not a random sample. It is contributed data. So there's no sampling methodology nor is there any randomness to it from which one could infer a population.* (Nagel Cert. Ex. 11, Seare dep. 70:22-71:4)

Similarly, Gee testified in the CIGNA UCR case as to why using "contributed" date precluded the Ingenix Database from satisfying the UCR definition: (1) the information collected by Ingenix *does not capture "the total population of the providers"*

*in the geozip area;* (2) Ingenix data "does not" know for any "geozip" how many *"different providers"* are *"represented in the charge data"*; and (3) Ingenix data is not able *"to tell what percentage of providers are represented by the charge data"* in a given geozip area. (Nagel Cert. Ex. 12, Gee Dep. Tr. (4/21/05) at 343:18-344:3; Nagel Cert. Ex. 13,Gee Dep. Tr. (4/6/05) at 162:21-163:14 (emphasis added). These defects render the Ingenix database unfit to determine UCR as defined in Ms. McDonough Plan and all of the policies which contain same or similar UCR definitions.

On July 28, 2004, following his review of Ingenix documents and consultation with Gee, Scare and others, Dr. Ott concluded:

UCR and Statistical Analysis . . .

*Further, data is contributed to Ingenix from payers, Ingenix does not select the data.* This is important from a statistical view because statistical estimation is based on the random selection of data. Random sampling allows for an underlying probability distribution for the data that is randomly collected to represent the entire population. *Contributed data has no known probability distribution for representing the entire population of charge data.* . . .

Also, *representativeness, is a statistical term. It implies that a statistical sample has been randomly selected to allow for a probability distribution for the sample random variables. This is not the case for the Ingenix data that is*

11

> *contributed*. A better description of this
> issue would be completeness of the Ingenix
> data as compared to the total of all charge
> data.

(Nagel Cert. Ex.14 INGENIXMDL001184013-16 (emphasis added).

The testimony of the Subscriber Plaintiffs' expert, Dr.
Bernard Siskin, taken in the CIGNA case and in this case,
mirrors the Ingenix representatives' testimony and the report
submitted by Dr. Ott. Dr. Siskin testified the contributed
data" used in the Ingenix database: 1) was not a "valid
probability sample,; 2) was not "representative" of the
population of providers; 3) could not be used to draw an
"inference" about the population of providers; 4) was "biased,";
and as a result; 5) could not "meet plan guidelines,"; and was
"inappropriate for use in computing R&C." (Nagel Cert. Ex.15,
Siskin Dep. Tr. (12/14/10) at 46:9-47:4, 93:21-94:3, 94:23-
96:10; Nagel Cert. Ex. 16, Siskin Dep. Tr. (12/15/10) at
463:23-464:16, 465:20-466:6

As part of Ingenix's cross-examination of Dr. Siskin in
the CIGNA case, Ingenix's counsel relied on and read the
relevant section of the Ingenix Subscriber Reference Manual
acknowledging Ingenix was a contributor database and not a
statistical sample.

> Q.  [By Ingenix Counsel] And I'll just read it
> for the record.  Ingenix collects charge data through
> an incentive based data contribution program available
> to its payer clients. . . This language does not state

that the data being collected is a sample; correct?

    A.   That is correct. It does not say that it is a sample and I'm aware that Susan [Scare] testified specifically that it is a contributor database, it is not a statistical sample. It cannot be used to draw any inferences about the population, and I agree with her.  This language does not state that Ingenix is taking a sample for the purposes of ascertaining any characteristics of the population of all provider charges of any particular CPT code in any geographic area for any period of time; correct?

    A.   Absolutely correct. And I believe [Susan Seare's] deposition said specifically that it can't do that.

Nagel Cert. Ex. 16 at 460:9-462:9. (emphasis added) These findings have been incorporated into the expert report and testimony of Dr. Siskin rendered in this case. (Nagel Cert. Ex. 8 (Sept. 16, 2011 report), Ex. 17(Siskin dep. 2/28/12 at 12:9-14:5) and Ex. 18 (Siskin dep. 5/23/12 at 196:6-25)

Horizon had acknowledged the goal of keeping patients in-network because reimbursements would be less and patients would not want to go to ONET providers. (Nagel Cert. Ex. 2, Slater dep. I 157:24-158:15) Horizon sought to increase the members cost of using ONET providers hoping that if they had more "skin in the game" they would utilize in network providers. (Nagel Cert. Ex.19, Bonvicino dep. 57:10-15)

Further, Horizon was well aware of the allegations that there were flaws in the Ingenix database. Nagel Cert. Ex. 20

(Basiakos dep. 10:1-2), Ex. 5(Pignatelli I 16:7-11) Despite this knowledge, no one at Horizon ever discussed discontinuing the use of the database because of its flaws, nor did they ever take any steps to verify the accuracy of the Ingenix data when they received it or to determine that the Horizon reimbursement rates were in fact UCR. (Nagel Cert. Ex. 5, Pignatelli I 23:10-24:1, 33:11-14) Even when Horizon received a request for information regarding the practice of using the Ingenix data from Senator Rockefeller pursuant to a United States Senate investigation, there was never an internal discussion as to whether the Ingenix data was valid. (Nagel Cert. Ex. 21, Pignatelli II 221:8-222:2) Despite this fact, Horizon indicated in its response to the Senator that "Horizon BCBSNJ recognizes the need to move from the Ingenix databases." (Nagel Cert. Ex. 22, Rockefeller letter)

Horizon is a data contributor to Ingenix. (Nagel Cert. Ex.21, Pignatelli II 166:18-21). When submitting data to Ingenix, Horizon certifies that "they have included all claims received for the time period requested." (Nagel Cert. Ex. 23, Horizon 000056604-56607). However, in actuality Horizon does not submit Medicare, Capitation, mental health or COB claims data to Ingenix. (Nagel Cert. Ex. 24, Horizon response to McDonough Interrog. 5) Because it contributed its data to Ingenix, Horizon received a discount on the price of buying the data. (Nagel Cert. Ex. 25, Pignatelli III 260:6-9)

14

The contract between Ingenix and Horizon provides that: "The Data is provided to Customer for informational purposes only. Customer acknowledges that the Data is a tool that Customer may use in various ways in its internal business. The Data does <u>not</u> provide to Customer a stated or an implied "reasonable and customary" charge, either actual or derived. The Data does <u>not</u> contain a stated or an implied "reasonable and customary" conversion factor. Any reliance upon, interpretation of and/or use of the Data by Customer is solely and exclusively at the discretion of Customer. . . ." (Nagel Cert. Ex. 26 Horizon 56767) Despite these disclaimers, Horizon used the flawed Ingenix database to determine the reasonable and customary charge, all in stark violation of the terms of the plans.

Knowing that the Ingenix data did not provide the "reasonable and customary charge" or the "charge of most providers in a geographic area", Horizon did nothing to ascertain the charge of most providers in order to conform with the Plan terms. Horizon had claims data at its fingertips and never looked to its own data in order to determine the charge of most providers in a geographic area to meet its obligation to pay pursuant to this standard. Incredibly, Horizon used its claims data in order to arrive at its own reimbursement methodology known as TOR. Nagel Cert. Ex. 21, Pignatelli II 158-

15

159. Yet, despite the use of its claims data for the TOR methodology, Horizon failed to use this same data in order to meet its contractual obligation to pay UCR based upon its Plan definition.

<u>ARGUMENT</u>

<u>POINT I</u>

<u>THE STATE REGULATIONS RELIED UPON BY HORIZON ARE
INAPPLICABLE AND DO NOT SHIELD HORIZON FROM LIABILITY
BECAUSE THIS IS AN ERISA ACTION</u>

As a starting point, Horizon's argument that it cannot be held liable in this ERISA action since it complied with the State Regulations must be rejected as a matter of law. In <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 208-210 (2004), the Supreme Court acknowledged that state law and regulations are not relevant to an adjudication of ERISA claims because ERISA provides a comprehensive legislative scheme for relief.

Similarly in <u>DeVito v. Aetna</u>, 536 F. Supp. 2d 523 (D.N.J. 2008), Judge Hochberg concluded that ERISA preemption precluded the consideration of New Jersey statutes and regulations in adjudicating plaintiff's claim for benefits.

This Court reiterated these principles in <u>Franco v. Connecticut General Life Ins. Co.</u>, supra 818 F. Supp. 2d 792, 820 ("ERISA expressly preempts all state laws insofar as they "relate to" employee benefit plans. 29 U.S.C. § 1144(a). The scope of the preemption provision is broad. <u>Pilot Life Ins. Co.</u>

16

v. Dedeaux, 481 U.S. 41, 47, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). A "state law 'relate[s] to' a benefit plan 'in the normal sense of the phrase, if it has a connection with or reference to such a plan.' " Id.)

Horizon successfully pressed this concept when this Court dismissed those Counts of McDonough's Complaint which asserted claims arising from the breach of the SEHP regulations. In McDonough v Horizon Blue Cross Blue Shield of New Jersey, 2011 WL 4455994 (D.N.J. 2011) the Court acknowledged that "This is the same regulation raised by Horizon in its unavailing argument that no claim can lie against it based on its use of Ingenix because such conduct complied with New Jersey law.. . . See 29 U.S.C. § 1144(a) (ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan.").

Thus, this Court previously considered and rejected Horizon's identical argument in denying its Rule 12(b)(6) motion to dismiss, stating:

> The regulation cited by Horizon in fact provides that ONET benefit payments may be based either on "allowed" charges for a service (referring to what plans, such as McDonough's, typically define as the "reasonable and customary" charges) or the provider's actual charge. Id. The regulation also provides that this "allowed" charge, or UCR, is to be determined according to fee schedules provided by Ingenix and specifies that "the maximum allowed charge shall be

17

based on the 80th percentile" of the Ingenix curve or range of prevailing fee information. *Id.* Though the regulation authorizes use of Ingenix, the Court nevertheless finds Horizon's argument unpersuasive.

McDonough's health benefits plan entitled her to ONET benefits based on the "reasonable and customary charges" for the service obtained. The plan assured that the standard of "reasonable and customary" would reflect "an amount which is most often charged for a given service by a Provider within the same geographic area." (Am.Compl., ¶ 21.) McDonough alleges that she was under-reimbursed for several ONET services because Horizon used a flawed database to determine the "reasonable and customary charges" for the services—a standard that Plaintiff alleges Horizon did not meet when it used a database it knew could not generate accurate UCR information and thus could not comply with the plan definition of "reasonable and customary." . . . The cited SEHP regulation may not be used by Horizon as a shield, particularly in light of its own alleged involvement in the corruption of the Ingenix database and the available option, under the very same regulation, of calculating the ONET benefit using the provider's actual charge.

McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc.,

CIV.A. 09-571 SRC, 2011 WL 4455994 (D.N.J. Sept. 23, 2011)

Horizon's attempt to again use the SEHP regulations as a shield against liability must be rejected as a matter of law.[4]

---

[4] While McDonough's counsel is flattered that Horizon quotes from an Article written by Mr. Nagel for the New Jersey Law Journal as authority, his views in 2005 have nothing to do with the issue before the Court now.

In essence, Horizon's motion for summary judgment is nothing more than an untimely and rehashed motion for reconsideration of the rejection of this previously raised argument in connection with its unsuccessful Rule 12(b)(6) motion. As no basis has been presented for reexamining this well-established principle of law under ERISA, Horizon's motion should be denied.

Alternatively, and without waiver of our position, even if the Small Employer Health Plan regulations govern Horizon's choice of UCR methodology, these regulations do not provide a basis for summary judgment in favor of Horizon. The applicable regulations give Horizon the option of paying billed charges or the 80th percentile of Ingenix.

Horizon was well aware of the highly publicized claim that there were flaws in the Ingenix database. Nagel Cert. Ex. 20 (Basiakos dep. 10:1-2), Ex. 5(Pignatelli I 16:7-11) However, Horizon never took steps to verify the accuracy of the Ingenix data when they received it or to determine that the Horizon reimbursement rates were in fact UCR. (Nagel Cert. Ex. 5, Pignatelli I 23:10-24:1, 33:11-14)[5] Moreover, the contract

---

[5] When Horizon received a request for information regarding the practice of using the Ingenix data from Senator Rockefeller pursuant to a United States Senate investigation, Horizon indicated in its response to the Senator that "Horizon BCBSNJ recognizes the need to move from the Ingenix databases." (Nagel Cert. Ex. 22, Rockefeller letter).

between Ingenix and Horizon made it clear that Ingenix expressly stated that the data did not represent stated or an implied "reasonable and customary" charge, either actual or derived. (Nagel Cert. Ex. 26 Horizon 56767)

Given Horizon's knowledge of the flaws in the Ingenix database and the express disclaimer contained in the Ingenix Contract, Horizon was obligated to choose the option in the regulation to pay billed charges. Instead of choosing this option, they used a database which they knew did not provide UCR and knew it did not provide the "most often charged" standard in their policies.

Horizon now contends that Plaintiff and the court have been misconstruing the applicable regulation, and that Horizon does not have the choice to pay either the allowed amount or billed charges.[6] However, that is precisely what N.J.A.C. 11:21-7.13 provided: "small employer carriers shall pay covered charges for medical services, on a reasonable and customary basis or actual charges. . . "[7]

Given the lack of ambiguity in the language of the regulation there is no reason to look beyond it. As the Court held in Thomsen v. Mercer-Charles, 187 N.J. 197, 206, 901 A.2d

---

[6] This assertion is belied by Horizon's expert's analysis of the claims data and admission that many of McDonough's ONET claims were paid at charges. (Nagel Cert. Ex.3 at p. 35)

[7] The 2009 amendment merely substituted the term "allowed amount" for the term "reasonable and customary."

20

303, 308 (2006) in interpreting a statute the court should "interpret the language in accordance with its plain meaning if it is "'clear and unambiguous on its face and admits of only one interpretation."' _State v. Thomas_, 166 _N.J._ 560, 567, 767 _A._2d 459 (2001) (quoting _State v. Butler_, 89 _N.J._ 220, 226, 445 _A._2d 399 (1982)). If the statute's language "'is susceptible to different interpretations, the court considers extrinsic factors, such as the statute's purpose, legislative history, and statutory context to ascertain the legislature's intent."' _Aponte-Correa v. Allstate Ins. Co._, 162 _N.J._ 318, 323, 744 _A._2d 175 (2000) (quoting _Twp. of Pennsauken v. Schad_, 160 _N.J._ 156, 170, 733 _A._2d 1159 (1999). The same analysis should be applied by the Court in this case in interpreting these unambiguous administrative regulations.

Horizon attempts to go beyond the clear language of the regulation and relies upon Agency Responses to Public Comments challenging the SHE Board Amendments as a basis for its claim that Ingenix is the maximum amount the carrier is responsible to pay for a service or supply. (David Jay Cert. at Ex. 11) However, the conglomeration of quotes from these comments at Db 14-15 do not provide that insurers are barred from paying actual charges for ONET services or that insurers would somehow be

penalized for doing so.[8] To the extent that the Responses to the Comments seem to indicate that Ingenix should be a cap on ONET reimbursements, we submit that the despite the deference accorded an administrative agency's interpretation of its enabling statute, the SEH Board cannot vary the clear language of the regulations through the back door. See e.g._ In re Freshwater Wetlands General Permit Number 16, 379 N.J. Super. 331, 342, 878 A.2d 22, 29 (App. Div. 2005) (explaining that an agency may not use its authority to interpret its own regulations as a means to amend those regulations or adopt new ones). Venuti v. Cape May County Constr. Bd. of Appeals, 231 N.J.Super. 546, 554, 555 A.2d 1175 (App.Div.1989) (citations omitted).See also 40 N.J. Prac., Appellate Practice and Procedure § 4.17 (2d ed.)

Consequently, we submit that even if the Court chooses to consider the regulations as impacting Horizon's obligations, (despite the fact that this is clearly an ERISA case and the

---

[8] Further, Horizon has also ignored the reasons why the New Jersey Small Employer Health Benefits Program Board declined to change the regulations and move away from the use of Ingenix when it was amending the regulations: "the settlements [in recent lawsuits concerning Ingenix] require development of a new database, after which carriers subject to the settlement agreements have agreed to cease using the Ingenix database and begin using the new one." (David Jay Cert. at Ex. 11 p. 3) Thus, the permitted continued use of Ingenix by DOBI is not a ringing endorsement.

language of the policy governs), the regulations should be considered in their entirety and the clear and unambiguous language giving the insurer the choice of paying either the allowed amount or billed charges should govern.

Hence, Horizon has not presented any reasons why this Court should reconsider its decision that the regulations do not preclude McDonough's claims.

### POINT II

### HORIZON'S MOTION MUST BE DENIED SINCE THERE ARE NO FACTS IN THE RECORD WHICH SUPPORT COMPLIANCE WITH THE PLAN'S UCR DEFINITION

Under <u>Firestone Tire & Rubber Co. v. Bruch</u>,489 U.S. 101,111 (1989) and its progeny in the Third Circuit, where the plan terms are not ambiguous, they must be applied as written. <u>Firestone</u> at *111; <u>Bill Gray Enters., Inc. Employee Health & Welfare Plan v. Gourley</u>, 248 F.3d 206, 218 (3d Cir. 2001). A fiduciary that takes any actions inconsistent with plan terms has necessarily abused its discretion. <u>Id</u>. <u>Fleisher v. Standard Ins. Co.</u>, 679 F.3d 116, 121 (3d Cir. 2012) <u>Saltzman v. Indep. Blue Cross</u>, 384 Fed. App'x 107 at 112 (3d Cir. 2010).

Horizon states that it is "incontestable that Horizon paid Plaintiff the OON benefits that were due and owing to her" and that the "Court cannot find that Horizon abused its discretion." (Db9) Nothing could be further from the truth.

As admitted by Horizon, at least through the end of 2009, Horizon's plan terms required payment at the "amount which is most often charged for a given service by a Provider within the same geographic area." This plan term is not ambiguous.

However, Horizon also admitted that it paid McDonough for ONET services using its automated processing system resulting in a specific dollar amount extracted from the Ingenix database. Horizon has never disputed the key fact that amounts paid using Ingenix do <u>not</u> satisfy this plan definition. All the evidence developed in this case points to the fact that the Ingenix-derived amount is unrelated to, and is not, the "amount most often charged . . . ." Both of Plaintiff's experts have detailed why Ingenix does not represent the amount most often charged. The Ingenix database is a convenience sample and even Ingenix itself disclaims its use a valid determination of the amount most often charged. Horizon's experts have indicated that they did no testing and cannot say whether or not Ingenix represents the amount most often charged. (Nagel Cert. Ex. 1, Abernathy II at 130:13-17) Mr. Abernathy admitted that he did not analyze the Ingenix data in rendering his report and reaching his conclusions and acknowledged that Ingenix states that they are not producing the data as UCR. (Nagel Cert. Ex. 1, Abernathy II at 102-104) Horizon has its own method of determining UCR which was used for certain Horizon policies.

That method known as TOR was detailed during depositions of Horizon's representatives. TOR uses Horizon's own charge data by procedure code over an 18-month period. Ms. Pignatelli testified that they basically look at procedure codes and that they break those codes down by geographic area in a three-tiered geographic approach (northern, central and southern New Jersey). Every procedure code that was billed are the procedure codes that are used to come up with the TOR reimbursement system, which is the same procedure codes that are used for the Ingenix database. (Nagel Cert. Ex. 21, Pignatelli Dep. II at 158-159) Horizon's expert, Mr. Abernathy testified that he did not perform any analysis to determine if reimbursement using TOR reflected the amount most often charged for a given service by a provider within the same geographic area either. (Nagel Cert. Ex. 1, Abernathy II at 134:7-13) Thus, there is no evidence that Horizon ever took steps to confirm that it was complying with its plan terms and, as set forth *infra*, we contend that this failure to establish compliance requires summary judgment on this issue in favor of the plaintiff.

Had Horizon simply provided in its policies that it would reimburse ONET services at the 80th percentile of Ingenix, this would be a different situation. However, in this case, it is plain that Horizon did not comply with its plan definition.

The burden of demonstrating an absence of material facts remains with the moving party regardless of which party would have the burden of persuasion at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) We submit that it is uncontroverted that Ms. McDonough was not paid a UCR benefit as defined in the plan pursuant to §1132(a)(1)(B). Thus, Horizon's motion for summary judgment must be denied and our cross-motion for partial summary judgment must be granted.

### POINT III

#### SUMMARY JUDGMENT MUST BE DENIED WITH RESPECT TO MCDONOUGH'S BREACH OF FIDUCIARY DUTY CLAIMS

Cases that turn crucially on the credibility of the witnesses' testimony in particular should not be resolved on summary judgment. Anderson v. Liberty Lobby, 477 U.S. 242 at 249 (1986). Thus, cases will seldom lend themselves to summary disposition where intent and state of mind are implicated. Hutchinson v. Proxmire, 443 U.S. 111 (1979); U.S. ex rel. Catekin v. Univ. of Pittsburgh, 192 F.3d 402, 411 (3d Cir. 1999) (noting "basic rule" that state of mind issues typically should not be decided on summary judgment.)

Ms. McDonough has raised disputed issues of fact sufficient to preclude summary judgment with respect to the breach of fiduciary duty claim pled in Count III of the Amended Class

Action Complaint, virtually ignored by Horizon. As this Court previously held:

> To the extent, however, that the breach of fiduciary duty claim pled in Count III is based on Horizon's calculation of ONET benefits by using Ingenix in furtherance of Horizon's own interests, it will survive this motion to dismiss. As set forth above, Plaintiff alleges that Horizon used the flawed Ingenix database knowing it would provide artificially depressed UCR figures and thus result in the underpayment of ONET claims. These allegations sufficiently set forth that Horizon made ONET claims decisions in its own interest and at the expense of plan participants and beneficiaries, in violation of Horizon's fiduciary duty of loyalty under ERISA § 404(a)(1)(A). 29 U.S.C. § 1104(a)(1)(A); *Reich v. Compton*, 57 F.3d 270, 290 (3d Cir.1995).

McDonough v. Horizon Blue Cross Blue Shield of New Jersey, Inc., CIV.A. 09-571 SRC, 2011 WL 4455994 (D.N.J. Sept. 23, 2011).

Horizon's contention that there is no evidence that they engaged in any "wrongdoing", buried in a footnote at DB8, misconstrues the theory under which they may be held liable for failing to appropriately calculate Ms. McDonough's ONET benefits in breach of its fiduciary duty.[9]

---

[9] Horizon used the database to calculate ONET benefits to dissuade its insured from availing themselves of these plan benefits. Horizon acknowledged the goal of keeping patients in-network because reimbursements would be less and patients would not want to go to ONET providers. (Nagel Cert. Ex. 2, Slater dep. I 157:24-158:15) Horizon sought to increase the members cost of using ONET providers hoping that if they had more "skin

The simple facts are that Horizon was a data contributor to Ingenix and received discounts for being a data contributor. (Nagel Cert. Ex.21, Pignatelli II 166:18-21; Ex. 25, Pignatelli III 259:10-14) Further, Horizon certified to Ingenix that it turns over all of its data. (Nagel Cert. Ex. 23) However, it does not turn over all its data to Ingenix. Horizon does not access Medicare, Capitation, mental health or COB claims data to contribute to Ingenix. (Nagel Cert. Ex. 24, Horizon response to McDonough Interrog. 5) Thus, Horizon did contribute to creating the Ingenix flaws and was aware that Ingenix did not represent "an amount must often charged for a given service by a Provider in the same geographic area."

In Reich v. Compton, 57 F.3d 270, 290-291 (3d Cir. 1995), the court stated:

> In addition to making certain actions by fiduciaries illegal per se, ERISA also codified common law duties of loyalty and prudence for ERISA trustees. In relevant part, section 404(a) provides as follows:
> (a) Prudent man standard of care
> (1)[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;

in the game" they would utilize in network providers. (Nagel Cert. Ex.19, Bonvicino dep. 57:10-15)

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ...
> (D) in accordance with the documents and instruments governing the plan....
>
> Based on the summary judgment record, a reasonable factfinder could conclude that the fiduciaries violated their duties. . . We agree with the Second Circuit that trustees violate their duty of loyalty when they act in the interests of the plan sponsor rather than "with an eye single to the interests of the participants and beneficiaries of the plan." Donovan, 680 F.2d at 271.

Indeed, in that case the Court specifically rejected an argument similar to that made by Horizon, stating: "The Plan trustees argue that there was no violation of the duty of loyalty and prudence because the trustees had no superior alternative to the one they chose. Although there is evidence to support this view, the Secretary has adduced sufficient facts to make the district court's resolution of this issue by summary judgment improper." Reich v. Compton, 57 F.3d 270, 291 at n. 31 (3d Cir. 1995). The same result should obtain in the case at bar. See also Bussian v. RJR Nabisco, Inc., 223 F.3d 286, 296 (5th Cir. 2000) where the court denied summary judgment and noted that "[T]rustees violate their duty of loyalty when they act in the interests of the plan sponsor rather than 'with an eye single to the interests of the participants and

beneficiaries of the plan' ") (quoting Donovan v. Bierwirth, 680 F.2d 263, 271 (2d Cir.), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982)). See also Johnson v. Radian Group, Inc., Civil Action No. 08-2007, 2009 WL 2137241 at *22 (July 16, 2009, E.D. Pa. 2009)(ERISA plan fiduciaries violate the duty of loyalty when they actually act in the interests of the plan sponsor or of themselves rather than for the sole benefit of the participants and beneficiaries of the Plan.) ")

In Martin v. Feilen, 965 F.2d 660 (8th Cir. 1992), cert. denied. 506 U.S. 1054 (1993), the Court held that once an ERISA beneficiary proves a breach of fiduciary duty and a prima face loss or profit to the fiduciary, the burden shifts to the fiduciary to that the prove loss was not caused by his breach of duty. Here the burden has shifted to Horizon, yet Horizon will be unable to satisfy its burden of proof.

Horizon, like the fiduciary in Reich argues that it had no choice but to use Ingenix, and cites to a non-precedential, factually inapposite state court decision from West Virginia, Shrewsbury v. Nat'l Grange Mutual Ins. Co., 395 S.E. 2d 745, 750 (W. Va. 1990) In Shrewsbury, the plaintiff was an independent insurance agent whose agency agreement with the defendant insurance company, National Grange, had been terminated for unprofitability. Plaintiff contended that defendant was tortiously interfering with its contract with its clients when

National Grange contacted these clients who were insured by it to inform them of the termination of the agency relationship and to inform those clients who had automobile insurance coverage of their right to renew the policy by dealing directly with it. The notice to automobile liability policyholders was sent in order to comply with the West Virginia Insurance Commissioner's Informational Letter No. 39 concerning enforcement of W. Va. Code § 33-6A-4. The West Virginia court held that doing what the law required could not constitute a tort. The facts in this case are quite different. Horizon has a choice regarding the payment methodology, as either allowed charges or actual charges. Horizon chooses the method which favors their interests or the Plan Sponsor's interests, rather than the interests of the plan beneficiary. At the very least, plaintiff has raised sufficient issues of fact regarding Horizon's breach of fiduciary duty to preclude summary judgment.

POINT IV

BECAUSE IT IS UNDISPUTED THAT HORIZON FAILED TO PAY
MCDONOUGH "AN AMOUNT WHICH IS THE MOST OFTEN CHARGED
FOR A GIVEN SERVICE BY A PROVIDER WITHIN THE SAME
GEOGRAPHIC AREA" WHEN REIMBURSING FOR ONET SERVICES
MCDONOUGH IS ENTITLED TO SUMMARY JUDGMENT

New Jersey law is clear that "when interpreting an insurance policy, courts should give the policy's words their plain, ordinary meeting." Colliers Lanard & Axilbund v. Lloyds of London, 458 F.3d 231, 236 (3d Cir. 2006), citing NAV-ITS,

31

Inc. v. Selective Ins. Co. of Am., 183 N.J. 110, 869 A.2d 929, 933 (N.J. 2005). Insurance policies are considered contracts of adhesion. Cincinnati Ins. Co. v. Cham's Jewelry Art, Inc., 31 F. App'x 793, 795 (3d Cir. 2002). General contract principles apply to the court's interpretation of the ERISA plan. "An insurance policy should be interpreted according to the plain meaning" and any ambiguity "is ordinarily resolved in favor of the insured." Buczek v. Cont'l Cas. Ins. Co., 378 F.3d 284, 288-89 (3d Cir. 2004). ERISA contracts must be interpreted according to what a reasonable person "would have understood the words to mean." McGee v. Equicor-Equitable HCA Corp., 953 F.2d 1192, 1202 (10th Cir.1992). Clearly, the Court can only uphold an interpretation of plan language if it is "not contrary to the Plan language and . . . is rationally related to a legitimate Plan purpose." Orvosh v. Program of Group Ins. for Salaried Emps. of Volkswagen of Am., 222 F.3d 123, 131 (3d Cir. 2000). In essence, Horizon must comply with its plan documents. Dewitt v. Penn-Del Directory Corp., 106 F.3d 514, 520 (3d Cir. 1997).

Horizon has not, and cannot, dispute that the Ingenix database is not a valid statistical sample and does not represent "the amount most often charged for a given service by a Provider within the same geographic area." Hence, Horizon's position that it is complying with the plan terms by using Ingenix must be rejected as a matter of law.

As fully explained above, the inability of the Ingenix database to determine "the amount most often charged" is the conclusion reached by McDonough's experts and Ingenix officials themselves. This is why Ingenix's contract with Horizon specifically contained a disclaimer that Ingenix should <u>not</u> and <u>cannot</u>, be used to determine UCR. ((Nagel cert. Ex. 26, Horizon 56767) Indeed, the absence of statistical validity caused the Massachusetts Appellate Court to conclude that Ingenix data was too unreliable to even be admitted in evidence. <u>Michael Davekos, P.C. v. Liberty Mut. Ins. Co.</u>, 2008 Mass. App. Div. 32, 2008 Mass. App. Div. LEXIS12, at *11-14, (Mass. App. Div. Jan. 24, 2008); *see also* <u>N.E. Physical Therapy Plus Inc., v. Liberty Mut. Ins. Co.</u>, 2011 Mass. App. Div. 135, 2011 Mass. App. Div. LEXIS 24, at *10 (Mass. App. Ct. June 14, 2011). Citing the Massachusetts court's decision in <u>Davekos,</u> Judge Hochberg also extensively analyzed the Ingenix database before concluding that it suffered errors in three broad categories: data collection/supply errors; database creation/editing errors; and data analysis errors. <u>McCoy v. Health Net, Inc.</u>, 569 F. Supp. 2d 448, 464-65 (D.N.J. 2008).

The core issue is quite simple: did Horizon reimburse based upon the most often charged amount in the geographic area. Despite many opportunities to prove that they did, there

is absolutely nothing in this record which could lead to this conclusion. Simply put, Horizon failed to honor its plan terms and the Court should award summary judgment to McDonough on this claim.

<u>CONCLUSION</u>

For all of the foregoing reasons, the Court should deny Horizon's motion for summary judgment and grant Ms. McDonough's cross-motion for summary judgment.

Respectfully submitted,

*/s Bruce H. Nagel*

BRUCE H. NAGEL

Dated:  February 27, 2013

34