# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CATHLEEN McDONOUGH, *et al.*, | : | |
| | : | Civil Action No. 09-571(SRC) |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| HORIZON BLUE CROSS BLUE | : | |
| SHIELD OF NEW JERSEY, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**BRIEF ON BEHALF OF SEVERAL OBJECTORS OPPOSING:  (1) CERTIFICATION OF THE SETTLEMENT CLASS, (2) FINAL SETTLEMENT APPROVAL, AND (3) AN AWARD OF ATTORNEYS' FEES AND COSTS TO PLAINTIFFS' COUNSEL**

Eric D. Katz, Esq.
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 228-9898
Attorneys for Various Objectors

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

LEGAL ARGUMENT........................................................................................5

POINT I .............................................................................................................5

BRUCE H. NAGEL AND NAGEL RICE, LLP CANNOT SATISFY THE ADEQUACY OF REPRESENTATION STANDARD OF FED. R. CIV. P. 23 (G) BECAUSE OF A FATAL CONFLICT OF INTEREST CREATED BY MR. NAGEL'S DUAL REPRESENTATION OF THE MCDONOUGH/HELFMANN AND EDWARDS CLASSES. CONSEQUENTLY THE SETTLEMENT CLASS SHOULD NOT BE CERTIFIED AND MR. NAGEL AND HIS LAW FIRM DISQUALIFIED

A. Ethical Principles Demand Undivided Loyalty to All Class Members Under the Penalty of Disqualification..........................................................8

B. Mr. Nagel and his Firm Should Also be Disqualified Because the Dual Representation of the McDonough/Helfmann and Edwards Classes Constitutes an Improper "Zero Sum Game"...........................................11

POINT II.............................................................................................................14

THE PROPOSED CLASS REPRESENTATIVES CANNOT SATISFY THE ADEQUACY OF REPRESENTATION STANDARD OF FED. R. CIV. P. 23(A)(4) BECAUSE THEIR ECONOMIC INTERESTS AND OBJECTIVES SUBSTANTIALLY CONFLICT WITH MOST ABSENT CLASS MEMBERS. CONSEQUENTLY THE SETTLEMENT CLASS CANNOT BE CERTIFIED

POINT III.............................................................................................................18

THE REQUIREMENTS OF FED. R. CIV. P. 23(B)(3) TO CERTIFY A CLASS ON PLAINTIFFS' ERISA CLAIMS ARE DEMANDING, EVEN FOR SETTLEMENT APPROVAL, AND CANNOT BE SATISFIED HERE

POINT IV.............................................................................................................22

> THE COURT SHOULD REJECT THE PROPOSED SETTLEMENT BECAUSE
> IT PROVIDES NO BENEFITS TO CLASS MEMBERS.   UNDER THE
> PROPOSED SETTLEMENT 3 MILLION CLASS MEMBERS ARE
> RELEASING $10 BILLION IN CLAIMS FOR $0 AND A "BUSINESS
> REFORM" THAT WILL EXPOSE THEM TO SIGNIFICANTLY GREATER
> OUT-OF-NETWORK COSTS AND HIGHER BALANCE BILLS FOR ONET
> SERVICES

> A. The Court has a Duty to Protect Absent Class Members from an
>    Unfair Settlement.........................................................................22

> B. The Proposed Settlement Does Not Fall Within the "Range of
>    Reasonableness" ...........................................................................23

> C. The Proposed Settlement Benefits are Illusory and Have No
>    Value to the Class .........................................................................24

> D. Horizon was Replacing Ingenix with Medicare Regardless of this
>    Settlement .....................................................................................25

> E. Horizon's Replacement of Ingenix with Medicare Significantly
>    Damages the Class .........................................................................29

POINT V ...............................................................................................................33

> THE PROPOSED SETTLEMENT RELEASE IS GROSSLY OVERBROAD,
> CONTRAVENES NEW JERSEY LAW AND FATALLY PREJUDICES THE
> RIGHTS OF BOTH CLASS MEMBERS AND NON-CLASS MEMBERS
> ALIKE

POINT VI...............................................................................................................35

> THE PROPOSED RELEASE OF DENTIST PROVIDER CLAIMS
> CONSTITUTES A BREACH OF CONTRACT BY HORIZON AND ITS
> SETTLEMENT AGREEMENT IN THE KIRSCH CLASS ACTION

POINT VII ............................................................................................................38

> THE CLASS NOTICE IS DEFECTIVE AND DOES NOT COMPORT WITH
> THE MINIMUM REQUIREMENTS OF DUE PROCESS. THE NOTICE MUST
> BE SUBSTANTIALLY REVISED AND THEN DISSEMINATED AGAIN TO
> ALL ABSENT CLASS MEMBERS AND NON-CLASS MEMBERS
> NEGATIVELY IMPACTED BY THE PROPOSED SETTLEMENT

POINT VIII ....................................................................................................................41

    NO ATTORNEYS' FEES OR EXPENSES SHOULD BE AWARDED
    BECAUSE THERE ARE NO BENEFITS TO THE CLASS

POINT IX ......................................................................................................................43

    OBJECTORS ARE ENTITLED TO DISCOVERY BEFORE THE FAIRNESS
    HEARING IS SCHEDULED

CONCLUSION ...............................................................................................................45

## TABLE OF AUTHORITIES

**Page**

## CASES

Allen v. Holiday Univ., 249 F.R.D. 166 (E.D. Pa. 2008) ...............................................16

Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1996)......................................7,8,15,19,22

Am. Med. Assoc. v. United HealthCare Corp., 588 F. Supp. 2d 432
(S.D.N.Y. 2008) .................................................................................................27

Chateau de Ville Productions v Tams-Witmark Music,
474 F. Supp. 223 (S.D.N.Y. 1979)....................................................................8

Cotton v. Hinton, 559 F.2d 1326 (5th Cir. 1977) ......................................................43

Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170 (3d Cir. 2012) .......................16

Edwards v. Horizon Blue Cross Blue Shield of N.J.,
Civ. Action No. 08-6160 (KM)...................................................3,4,5,6,11,13,38

Ehrheart v. Verizon Wireless, 609 F.3d 590 (3d Cir. 2010).....................................24

Eisen v. Carlisle & Jacquelin, 391 F.2d 555 (2d Cir. 1968)......................................16

Eisen v. Carlisle & Jacquelin, 417 U.S. 156 (1974) ................................................ 40

Fiandaca v. Cunningham, 827 F.2d 825 (1st Cir. 1987).........................................11

Franco v. Conn. Gen. Life Ins. Co., 289 F.R.D. 121 (D.N.J. 2013) ...........................18,20

Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996)......................................7

Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975)........................................................23

Grant v. Bethlehem Steel Corp., 823 F.2d 20 (2d Cir. 1987) .....................................22

Greenfield v. Villager Indus., Inc., 483 F.2d 824 (3d Cir. 1973) .............................8,10,43

Hanlon v. Chrysler Corp., 150 F.3d 1011 (9th Cir. 1998).........................................22

Hansberry v. Lee, 311 U.S. 32 (1940) ..................................................................40

Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149 (2010) ..............................41

Hecht v. United Collection Bureau, Inc., 691 F.3d 219 (2d Cir. 2012)............................................40

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1997)...............................................14

In re Aetna UCR Litig., MDL No. 2020, Dkt. No. 07-cv-3541 (D.N.J.) ...............................................27

In re Air Crash Disaster Near New Orleans, La., 821 F.2d 1147
  (5th Cir. 1982)...........................................................................................................................12

In re Asbestos Litig., 134 F.3d 668 (5th Cir. 1998)...............................................12

In re CertainTeed Corp. Roofing Shingles Prods. Liab. Litig.,
  269 F.R.D. 468 (E.D. Pa. 2010)..............................................................................................15

In re Cmty. Bank of N. Va., 418 F.3d 277 (3d Cir. 2005) ("Cmty. Bank I") ...............................15,43

In re Cmty. Bank of N. Va., 622 F.3d 275 (3d Cir. 2010) ("Cmty. Bank II")...............................7
there
In re Domestic Air Transp. Antitrust Litig., 144 F.R.D. 421
  (N.D. Ga. 1992) .......................................................................................................................43

In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig.,
  55 F.3d 768 (3d Cir.), cert. denied, 516 U.S. 824 (1995) ...............................7,15,16,25,41

In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008).........................................19

In re Pet Foods Prods. Liab. Litig., 629 F.3d 333(3d Cir. 2010) ...............................23

In re Prudential Ins. Co. of Am. Sales Prac. Litig.,
  962 F. Supp. 450 (D.N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998) ......................10,15,43

In re Prudential Ins. Co. of Am. Sales Prac. Litig.,
  148 F.3d 283 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999) ...............................23

In re Warfarin Sodium Antitrust Litig., 391 F.3d 516 (3d Cir. 2004) .........................................7,16

Jackshaw Pontiac v. Cleveland Press Publ'g Co., 102 F.R.D. 183
  (N.D. Ohio 1984) .....................................................................................................................12

Jackson v. Se. Penn. Transp. Auth., 260 F.R.D. 168 (E.D. Pa. 2009)..............................................16

Kayes v. Pac. Lumber Co., 51 F.3d 1449 (9th Cir. 1995) ...............................10

Kirsch v. Horizon Blue Cross Blue Shield of N.J.,
  Docket Nos. ESX-L-4216-05, L-109-08 ...............................................35,36,37,39

Kirsch v. Horizon Blue Cross Blue Shield of N.J., 2013 WL 5507660
    (App. Div. Oct 7, 2013) ................................................................35

Krim v. PCOrder.com, Inc., 210 F.R.D. 581 (W.D. Tex. 2002).......................... 9,10

Kuper v. Quantum Chem. Corp, 145 F.R.D. 80 (S.D. Ohio 1992) ......................... 8,12

Kurczi v. Eli Lilly & Co., 160 F.R.D. 667 (N.D. Ohio 1995) ............................8,9,11

McDonough v. Toys "R" Us, Inc., 834 F. Supp. 2d 329 (E.D. Pa. 2011) ......................18

MHA, LLC v. Aetna Health, Inc., 2013 WL 705612
    (D.N.J. Feb 25, 2013).................................................................33,34

McCoy v. Health Net, Inc., 569 F. Supp. 2d 448 (D.N.J. 2008).................................27

Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781 (7th Cir. 2004) ...............................22

Moore v. Margiotta, 581 F. Supp. 649 (E.D.N.Y. 1984).........................................11

Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306 (1950) .............................40

Nat'l Air Traffic Controller Ass'n v. Dental Plans, Inc.,
    2006 WL 584760 (N.D. Ga. Mar. 10, 2006).............................................10

Ortiz v. Fibreboard Corp., 527 U.S. 815 (1999) ..............................................9

Pelt v. Utah, 539 F.3d 1271 (10th Cir. 2008) ...............................................8

Phillips Petro. Co. v. Shutts, 472 U.S. 797 (1985) .......................................... 40

Reynolds v. Chapman, 253 F.3d 1337 (11th Cir 2001) .....................................13

Ruderman v. Wash. Nat'l Ins. Co., 263 F.R.D. 670 (S.D. Fla. 2010) ......................... 9,10

Schreiber v. Kellogg, 50 F.3d 264 (3d Cir. 1995) ..........................................25

Schwartz v. Dana Corp., 196 F.R.D. 275 (E.D. Pa. 2000) ...................................16

Seijas v. Rep. of Argentina, 606 F.3d 53 (2d Cir. 2010) ......................................9

Staton v. Boeing Co., 327 F.3d 938 (9th Cir. 2003) .........................................22

Sullivan v. Chase Inv. Servs., 79 F.R.D. 246 (N.D. Cal. 1978) ...........................8,9,10,12

Sullivan v. DB Invs., Inc., 667 F.3d 273 (3d Cir. 2011) ...................................................22

Tedesco v. Mishkin, 689 F. Supp. 1327 (S.D.N.Y. 1988).................................................. 8

Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181 (11th Cir. 2003)...................... 16

Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239 (3d Cir. 1975) ........................................ 16

Wilson v. County of Gloucester, 256 F.R.D. 479 (D.N.J. 2009)....................................... 16

## RULES & REGULATIONS:

46 N.J.R. 1(1) (Jan. 6, 2014).........................................................................................28

Editor's Note to N.J.A.C. 11:3-29.4(e)(1) ....................................................................28

Fed. R. Civ. P. 23 ...............................................................................................7,14,15,19

Fed. R. Civ. P. 23(a)(4) ...........................................................................................passim

Fed. R. Civ. P. 23(b)(3)...............................................................................1,18,19,20,21

Fed. R. Civ. P. 23(e) ...........................................................................................................1

Fed. R. Civ. P. 23(g) .............................................................................................. 1,4,5,7

N.J.A.C. 11:3 ...................................................................................................................28

## OTHER AUTHORITIES:

Comm. on Commerce, Science & Transp., 111th Cong., *Underpayment to
Consumers by the Health Insurance Industry*, Staff Report for Chairman
Rockefeller (June 24, 2009) ..........................................................................................26

Emily Berry, *Ingenix name retired as United re-brands subsidiaries*,
AMERICAN MEDICAL NEWS, April 26, 2011............................................................... 28

John Carroll, *Reformed UCR Calculations Not Without Problems*,
MANAGED CARE MAGAZINE ONLINE, June 2012....................................................... 32

Julia Applebee, *Medical bills hold nasty surprises: Price of going
out-of-network has gone way up for many*, USA TODAY, Feb. 9, 2012.......................32

Kahn & Parke, *Using Medicare RBRVS for reimbursing out-of-network claims in commercial insurance*, MILLIMAN WHITE PAPER, Feb. 2012 ......................................31

Manual for Complex Litigation, Fourth, § 21.61 (2004) ...............................................24

McLaughlin on Class Actions § 4:39 (5th ed. 2009) ........................................................9

New York State Dept. of Fin. Servs., *An Unwelcome Surprise: How New Yorkers are Getting Struck with Unexpected Medical Bills From Out-of-Network Providers* (March 7, 2012) ..............................................................31

Nina Bernstein, *Insurers Alter Cost Formula; Patients Pay*, NY TIMES, April 24, 2012 .....................................................................................................32

State of New York Office of the Attorney General, *Health Care Report: The Consumer Reimbursement System is Code Blue* (Jan. 23, 2009).............................25

Wright, Miller & Kane, Federal Practice and Procedure § 1769.1 (2d ed. 1986) .........................................................................................................9

## INTRODUCTION

These objections are filed on behalf of several McDonough/Helfmann "Subscriber" and "Provider" Class Member objectors and Non-Class Member physician, physician group and associational objectors (collectively "Objectors").[1]  Objectors oppose:  (1) certification of the settlement class; (2) final approval of the proposed settlement; and (3) an award of attorneys' fees and costs to plaintiffs' counsel.[2]

The settling parties are asking this Court to certify a settlement class that cannot satisfy the requirements of Fed. R. Civ. P. 23(a)(4), 23(g) and 23(b)(3).  Moreover, even assuming a settlement class could be certified, the settlement itself should not be approved because, in accordance with the analysis this Court must undertake under Fed. R. Civ. P. 23(e), the settlement is not "fair, reasonable or adequate."

The settling parties request final approval of a settlement that releases $10 billion in damages claims for $0 in payments to the Class, and where the sole settlement "benefit" is Horizon's agreement to terminate its use of two out-of-network ("ONET") provider reimbursement databases, chiefly the Ingenix database.  However, Horizon's decision to stop using Ingenix is neither beneficial nor valuable to the Class and, in fact, will result in

---

[1]    The Objectors are identified in the Rider attached hereto as Exhibit "A."  The Non-Class Member physician, physician group and associational objectors have today filed a motion to intervene and fully join in all of the objections set forth herein.

[2]    According to the Settlement Agreement (D.E. 305), proposed Class Counsel on behalf of the Settlement Class is Bruce H. Nagel and the law firm of Nagel Rice LLP.  The agreement also states that "various [other] counsel" may share in any fee award.  Consequently, while any reference to proposed Class Counsel in this objection shall refer to Mr. Nagel and his law firm specifically, the arguments set forth herein shall be equally applicable to any other plaintiffs' counsel in these two class actions.

1

substantially detrimental economic consequences to the 3 million absent Class Members, both "Subscriber" and "Provider" Class Members alike.

As an initial matter, Horizon's choice to abandon Ingenix was by necessity, and had nothing to do with this litigation or its proposed settlement. As we address herein, and this Court is aware, Ingenix was long ago rendered obsolete and does not even function as an ONET reimbursement database any longer. In fact, in September 2013, prior to this settlement, Horizon had already publicly disclosed that it was replacing Ingenix with Medicare-based fees as its primary database to calculate ONET payments. Horizon was compelled to make this decision because Ingenix "is no longer available" and for no other reason.

Although Medicare reimbursement has been already implemented by Horizon, and will remain the primary methodology Horizon will utilize to determine ONET fees whether this settlement is approved or not, it speaks volumes about the inadequacies of the proposed settlement that the parties failed to even identify that Medicare would be replacing Ingenix, thus depriving the Class and this Court of any opportunity to determine whether there is any value to the switch and whether Class Members will be in a better or worse economic condition as a result.

Objectors believe that the failure of the settling parties to identify Medicare in connection with the proposed settlement was intentional, because government and private sector reports and analyses that have investigated the use of Medicare to calculate ONET fees in place of usual, customary and reasonable ("UCR") databases, such as Ingenix, have found in virtual unanimity that Medicare results in systemic lower payments to ONET providers and thus significantly increases out-of-pocket expenses to subscribers that seek ONET treatment. In short, Horizon's change to Medicare will substantially damage both McDonough/Helfmann subscribers and

providers alike. Providers will be paid less for their services, and subscribers will be forced to foot the "balance bills"[3] for these services.

Moreover, the settling parties have included a Release that is both overbroad and in violation of New Jersey law because it requires subscribers to revoke assignments of benefits previously given to both Class Members and Non-Class Member providers. The ramifications of this Release are obvious. If, for example, a "Provider" Class Member opts-out of the settlement, but the "Subscriber" Class Member he/she treated does not, the provider's opt-out is illusory because he/she would have lost any right to proceed against Horizon for underpayment once the assignment was revoked. As for Non-Class Member providers, in particular medical doctors, the revocation of the assignments is unknown to the physicians as they did not receive the Class Notice advising of the settlement or explaining its terms. The end result, in both situations, is the exposure of the "Subscriber" Class to exorbitant balance bills from providers that are now denied any rights that they previously had to pursue Horizon directly for proper payment.

Objectors have also filed today a companion motion to disqualify Bruce H. Nagel and the law firm of Nagel Rice, LLP from any further representation of the putative McDonough/Helfmann Class because in attempting to settle this action, Mr. Nagel has created a fatal conflict of interest by his dual representation of the 3 million member proposed McDonough/Helfmann Settlement Class and the approximately 70 ambulatory surgical centers ("ASCs") that have been strategically carved out of the proposed settlement. Under the proposed agreement, Mr. Nagel intends to continue to represent the ASCs in their competing class action against Horizon, captioned Edwards v. Horizon Blue Cross Blue Shield of New Jersey, Civil

---

[3] "Balance billing" is the accepted industry practice of an ONET provider billing a subscriber (patient) for the difference between what the subscriber's health insurance reimburses and what the provider charges.

3

Action No. 08-6160 (KM) ("Edwards").  In doing so, Mr. Nagel has preserved the rights of the ASCs to seek money damages, despite being only a miniscule subset of all affected plaintiffs impacted by Horizon's underpayment of ONET claims, to the fatal detriment of 3 million other victims that walk away with nothing.  Equally perverse, Mr. Nagel will be able to reap two separate multi-million dollar fee awards from the two cases should he not be disqualified.  Mr. Nagel's dual representation and the tactical decisions he was compelled to make as a result violate Rule 23(g) and ethical principles requiring undivided loyalty to all Class Members.

These objections, and others asserted by Objectors, are addressed more fully below.[4]

---

[4]      Objectors expect to request leave to supplement their position after having an opportunity to review the motion(s) to be filed by Mr. Nagel and/or Horizon, including: (1) motion to certify a settlement class; (2) motion for settlement final approval; and (3) motion for attorneys' fees and expenses.  According to the Preliminary Approval Order these motion(s) will not be filed until March 14, 2014.

## LEGAL ARGUMENT

### POINT I

**BRUCE H. NAGEL AND NAGEL RICE, LLP CANNOT SATISFY THE ADEQUACY OF REPRESENTATION STANDARD OF FED. R. CIV. P. 23 (G) BECAUSE OF A FATAL CONFLICT OF INTEREST CREATED BY MR. NAGEL'S DUAL REPRESENTATION OF THE MCDONOUGH/HELFMANN AND EDWARDS CLASSES. CONSEQUENTLY THE SETTLEMENT CLASS SHOULD NOT BE CERTIFIED AND MR. NAGEL AND HIS LAW FIRM DISQUALIFIED[5]**

Rule 23(a)(4) and (g)(4) focus on the adequacy of representation. Specifically, Rule 23(g)(4) makes clear that the "standard" for appointment requires that "Class counsel must fairly and adequately represent the interests of the class." In the case at bar, Mr. Nagel and his law firm should be disqualified from any further representation of the McDonough/Helfmann Class because of a fatal conflict of interest created by Mr. Nagel himself in attempting to represent both the proposed settlement class in this action and the putative class of ambulatory surgical centers ("ASCs") in the matter of Edwards v. Horizon Blue Cross Blue Shield of New Jersey, Civil Action No.: 08-6160(KM).[6] Like these actions, the parallel and competing Edwards case involves allegations by ONET providers suing the same defendant, Horizon, for underpayment of ONET services based on flawed UCR databases. Mr. Nagel has, nevertheless, expressly carved out the Edwards ASCs from this settlement so that they may continue with their litigation against Horizon in the other case and pursue the monetary payments that the McDonough/Helfmann Class is releasing. At the same time Mr. Nagel has preserved the

---

[5] Objectors have formally moved to disqualify Mr. Nagel and Nagel Rice, LLP in a companion motion filed today.

[6] Not only has Mr. Nagel not disclosed this conflict of interest to the 3 million Class Members he seeks to represent, it also appears that he never disclosed this conflict of interest to this Court.

opportunity to cash-in on two significant multi-million dollar fee awards between the parallel actions.

Specifically, the parties' Settlement Agreement (D.E. 305) at ¶ 7.1(c) states:

> Ambulatory Surgical Centers are excluded from the Class, excluded from the definition of Releasing Parties, and release no claims pursuant to this Agreement. This exclusion applies to all ASC claims, **whether directly asserted by the ASC or by virtue of an assignment by the patient**. (Emphasis added.)

Equally disturbing, as emphasized, ¶ 7.1(c) clearly demonstrates that proposed class counsel was aware of the impact of requiring the "Subscriber" Class to revoke assignments of benefits because counsel made sure to expressly carve out any ASC claims based on "an assignment by the patient," something that was not done in the proposed settlement.   As we address in Point V, infra, the ramifications of revoking assignments exposes subscribers to significant risk of balance billing from members of the "Provider" Class that choose to opt-out of the settlement as well as thousands of Non-Class Member physicians (*i.e.* the medical doctors and osteopathic physicians) that are not part of the McDonough/Helfmann Settlement Class.  See ¶ 7.2(a) of the agreement, stating in pertinent part:

> Each of the Releasing Parties either (i) represents and warrants that he or she has not provided an assignment of any Released Claims, or (ii) to the extent permitted by law, **hereby revokes any such assignment for any Released Claim provided prior to the execution of this Agreement; provided, however, that this provision shall not apply to any claims that have been asserted as of the date of this Agreement in Edwards . . . . . The Parties reserve their rights with respect to all such claims**. (Emphasis added).

In short, Mr. Nagel has intentionally created an irresolvable conflict of interest, relinquishing the rights of 3 million McDonough/Helfmann Class Members that will receive $0 from this settlement and instead preserving the rights of approximately 70 Edwards ASCs to receive monetary benefits in the parallel class action.  At the same time, proposed class counsel has compounded the economic plight of the "Subscriber" Class by compelling it to revoke

assignments of benefits as part of the Release thereby exposing these Class Members to substantial provider balance billing. Under these circumstances, we believe disqualification is warranted.

Class actions by their very nature require that a judgment, if entered, have a preclusive effect on absent Class Members that often had no knowledge of the pending litigation much less any understanding of the full legal ramifications of a class settlement release of their claims. Consequently, this Court maintains a fiduciary responsibility to absent Class Members to ensure that all Fed. R. Civ. P. 23 due process and other requirements have been satisfied. See Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir.), aff'd, 521 U.S. 591 (1996).

It is fundamental that a settlement-only class certification must be scrupulously reviewed for potential due process violations of absent Class Members. Where, as here, the settlement negotiations preceded class certification of a litigation class, and certification of a settlement class and settlement approval are now sought simultaneously, district courts must be "even more scrupulous than usual" in evaluating the fairness of the settlement. In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 534 (3d Cir. 2004) (quoting In re Gen. Motors Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 805 (3d Cir.), cert. denied, 516 U.S. 824 (1995)).

"Although questions concerning the adequacy of class counsel were traditionally analyzed under the aegis of the adequate representation requirement of Rule 23(a)(4) . . . those questions have, since 2003, been governed by Rule 23(g)." In re Cmty. Bank of N. Va., 622 F.3d 275, 292 (3d Cir. 2010) ("Cmty. Bank II") (citation omitted). At the same time, "'[r]ealistically, for purposes of determining adequate representation, the performance of class counsel is intertwined with that of the class representative' [because] '[e]xperience teaches that it is counsel for the class representative and not the named parties . . . . who direct and manage

[class] actions. Every experienced federal judge knows that any statements to the contrary [are] sheer sophistry.'" Id. (quoting Pelt v. Utah, 539 F.3d 1271, 1288 (10th Cir. 2008); Greenfield v. Villager Indus., Inc., 483 F.2d 824, 832 n.9 (3d Cir. 1973)).   Consequently, because the cornerstone of the "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflict of interest[,]" Amchem, supra, 521 U.S. at 625, that same standard is equally applicable when considering the adequacy of counsel vying to represent the Class.

## A.   Ethical Principles Demand Undivided Loyalty to All Class Members Under the Penalty of Disqualification

"Attorneys representing a class bear an independent duty to protect the interests of that class." Tedesco v. Mishkin, 689 F. Supp. 1327, 1339 (S.D.N.Y. 1988).   Because "the unnamed members of the class are not present to protect their rights, the district court must accordingly take special care to guarantee the propriety and adequacy of the class' legal representation." Id. "The canons of legal ethics require undivided loyalty on the part of an attorney and instruct that even the appearance of impropriety be avoided.   In a class action, it is especially important to avoid even the appearance of divided loyalties." Id. at 1339-40 (citing Chateau de Ville Productions v Tams-Witmark Music, 474 F. Supp. 223, 226 (S.D.N.Y. 1979); Sullivan v. Chase Invs. Servs., 79 F.R.D. 246, 258 (N.D. Cal. 1978)).

In the class action context, specifically, courts have not hesitated to disqualify sitting class counsel on the grounds of inadequacy where a serious conflict of interest is revealed. Kuper v. Quantum Chem. Corp, 145 F.R.D. 80, 82-83 (S.D. Ohio 1992) (class certification denied in light of class counsel's divided loyalties, i.e., a commitment to zealously represent dueling classes' interests as they vied for relief from the same limited source). See also Kurczi v. Eli Lilly & Co., 160 F.R.D. 667, 679 (N.D. Ohio 1995) (conflict "intolerable" where absent class members, due to conflict of interest, "are at great risk of being sold out": class certification

denied in light of overall considerations, including this one); Sullivan, supra, 79 F.R.D. at 258

(requiring, as prerequisite of class action proceeding, an affidavit certifying complete withdrawal

from further representation of parallel client where continued representation would be great

enough to influence litigation strategy, citing disciplinary and ethical rules).

As one district court has cogently explained, a disqualifying "[c]onflict[] of interest may

exist for class counsel if they are involved in multiple lawsuits . . . against the same defendants."

Krim v. PCOrder.com, Inc., 210 F.R.D. 581, 589 (W.D. Tex. 2002) (citing 7A Wright, Miller &

Kane, Federal Practice and Procedure § 1769.1, at 384 (2d ed. 1986)).

> Indeed, "[c]ourts have consistently held that counsel cannot simultaneously
> represent a class and prosecute . . . class claims against the same defendants in a
> different proceeding." 1 McLaughlin on Class Actions § 4:39 (5th ed. 2009)
> (citing Ortiz v. Fibreboard Corp., 527 U.S. 815, 856 . . . (1999) (stating that "an
> attorney who represents another class against the same defendant may not serve as
> class counsel," and finding conflict of interest where attorneys represented
> proposed settlement class and also separately represented individual clients with
> prior-negotiated, more favorable settlement)).
>
> [Ruderman v. Wash. Nat'l Ins. Co., 263 F.R.D. 670, 684-85 (S.D. Fla. 2010).][7]

See also Seijas v. Rep. of Argentina, 606 F.3d 53, 57 (2d Cir. 2010) (noting that "[a]

number of courts have recognized the problems associated with . . . overlapping

representation") (collecting authority).

In Kurczi, supra, 160 F.R.D. at 678-79, the district court warned that special dangers exist

where "potential class members are at risk that counsel will trade off the interests of certain of its

clients to the detriment of other clients." The court found such a conflict "intolerable." Id. As

the Krim court wrote:

---

[7] Although the Ruderman court found no actual conflict, it agreed, at 685, that situations
might arise "where counsel seeking to represent both class members and individual plaintiffs in
separate actions against the same defendant suffers from an actual conflict," such as where a
common pool of assets is pursued that might be insufficient to satisfy all judgments, see Point
I(B), infra.

> Class counsel must act with unwavering and complete loyalty to the class members they represent, and the "responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." Kayes v. Pac. Lumber Co., 51 F.3d 1449, 1465 (9th Cir. 1995) (citing Sullivan v. Chase, 79 F.R.D. 246, 258 (N.D. Cal. 1978)).
>
> [Krim, supra, 210 F.R.D. at 589.]

See Ruderman, supra, 263 F.R.D. at 677 (same); Nat'l Air Traffic Controller Ass'n v. Dental Plans, Inc., 2006 WL 584760, at *4 (N.D. Ga., Mar. 10, 2006) ("The appearance of divided loyalties includes both differing and potentially conflicting interests, not merely instances actually manifesting such conflict."); In re Prudential Ins. Co. of Am. Sales Prac. Litig., 962 F. Supp. 450, 519 (D.N.J. 1997), aff'd, 148 F.3d 283 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999) ("Counsel who have separate inventories of cases, may compromise class representation."). Cf. Greenfield v. Villager Indus., Inc., 483 F.2d 824, 831-32 (3d Cir. 1973) (noting the real and vital fiduciary obligations of counsel in class actions).

Here, Mr. Nagel has chosen to conflict himself thereby making him unsuitable to continue to represent the McDonough/Helfmann Class. Mr. Nagel entered settlement negotiations without disclosing to the 3 million-member Class he seeks to represent that he concurrently represents a handful of ASCs in the competing and parallel Edwards class action, involving similar claims for underpaid ONET services coming from the same source (Horizon). Instead of avoiding the obvious conflict, Mr. Nagel decided to employ a strategy where he expressly carved out ASCs so that his firm could litigate both class actions and thus preserve the opportunity to garner two handsome multi-million dollar fee awards. Mr. Nagel then traded the $10 billion claim of 3 million Class Members -- calculated by his expert "with reasonable certainty" -- for $0 and a "business reform" that Horizon was doing regardless of the settlement, and one that will actually result in greater out-of-pocket expenses and greater balance bills to the

"Subscriber" Class. See Points IV and V, infra. In sum, because Mr. Nagel cannot satisfy the adequate counsel standard, the proposed settlement class should not be certified and counsel's disqualification is required.

**B.      Mr. Nagel and his Firm Should Also be Disqualified Because the Dual Representation of the McDonough/Helfmann and Edwards Classes Constitutes an Improper "Zero Sum Game"**

There is a second basis to disqualify Mr. Nagel and his firm. Because Mr. Nagel is administering simultaneous class actions against the same defendant, i.e., the McDonough/Helfmann and Edwards classes are both suing Horizon and the money to pay damages comes from the same pot, counsel "wind[s] up playing a zero sum game, in which every dollar awarded" to the ASCs and every dollar of attorneys' fees ultimately awarded to Mr. Nagel in Edwards "represents one dollar less that is available for distribution to class members" in the McDonough/Helfmann action. See Moore v. Margiotta, 581 F. Supp. 649 (E.D.N.Y. 1984) (where two different classes laid claim to the same monies on different damages theories requiring disqualification of counsel); Fiandaca v. Cunningham, 827 F.2d 825 (1st Cir. 1987) (holding it "inconceivable that [class counsel] . . . could properly have performed the role of 'advocate' for both . . . class[es]. . . ."); Kurczi, supra, 160 F.R.D. at 678-79 (same).

The gravity of this conflict is highlighted by the service of a damages expert report in the case at bar, "calculate[ing] with reasonable certainty" class-wide damages at approximately $10 billion. (D.E. 249-3). This does not even account for what we believe are potential damages in Edwards that will exceed $1 billion, and perhaps exceed that figure significantly.[8] It is highly unlikely that Horizon would be able to pay one class, let alone all damages sought by both classes should defendant be saddled with a "grand slam" adverse verdict or judgment against it.

---

[8]      Mr. Nagel has consistently filed documents in the Edwards matter "under seal" so that damage calculations, to our knowledge, are not available for the public to review.

Regardless, any payments to plaintiffs would come from the same source (Horizon), with each dollar paid in one action depleting the ability to pay a dollar in the other.

Courts have regularly found an actual conflict where parallel actions pursue a common pool of assets that might be insufficient to support the total amount sought. Kuper v. Quantum Chem. Corp., supra, 145 F.R.D. at 83 (denying class certification where competing claims may impair counsel's ability to vigorously pursue the interests of both classes); Jackshaw Pontiac v. Cleveland Press Publ'g Co., 102 F.R.D. 183, 192 (N.D. Ohio 1984) (declining to find Rule 23(a)(4) satisfied where it was "not inconceivable" that amounts sought would exceed total assets of the defendants); accord Sullivan, supra, 79 F.R.D. at 258. See also In re Air Crash Disaster Near New Orleans, La., 821 F.2d 1147, 1176 (5th Cir. 1982) (Gee, J., concurring in part, dissenting in part) ("Unlike most economic situations, the damage suit is a classic zero-sum game and hence is subject to a simple static analysis: what the plaintiff gains, the defendant loses.").

Significantly, even if Mr. Nagel (or Horizon for that matter) attempted to argue that there would be enough assets to pay as much as $11 billion or more in underpaid ONET claims between the McDonough/Helfmann and Edwards cases -- which would seem highly unreasonable based on Horizon's annual publicly available financial reports -- that still would not eliminate the conflict or save Mr. Nagel. For example, in In re Asbestos Litigation, 134 F.3d 668, 679 (5th Cir. 1998), the Fifth Circuit observed that even in Amchem, supra, where defendants had a theoretically unlimited supply of dollars with which to pay claimants and thus "class members' potentially conflicting interests were thus arguably not pitted against one another," still "that settlement made 'essential allocation decisions' by which some class members won and some lost. Thus, the [Supreme] Court worried that the settlement had chosen

winners and losers 'with no structural assurance of fair and adequate representation for the diverse groups and individuals affected.'"

In the case at bar, the conflict is even more insufferable because Mr. Nagel made the decision to allocate <u>every</u> potentially available dollar from Horizon to the <u>Edwards</u> ASCs and ensured there would be a pot of money for his other clients by negotiating a settlement that paid nothing to <u>McDonough/Helfmann</u> Class Members.  Consequently, this Court should be very concerned that Mr. Nagel, laboring under the conflict of representing competing classes of plaintiffs in two parallel class actions, will not be able to adequately serve the Class Members in the instant matter, let alone class plaintiffs in an action over which this Court has no control. <u>Cf.</u> <u>Reynolds v. Chapman</u>, 253 <u>F.</u>3d 1337, 1345 (11th Cir 2001) (in criminal law context, noting that defense attorney made clear choice to sacrifice interests of one client for benefit of other and stating: "It is obviously impossible to effectively serve both clients' interests in such a zero-sum game.").

For all of these reasons, Mr. Nagel and Nagel Rice, LLP should be disqualified because counsel cannot adequately satisfy the representational requirements under the Federal Rules of Civil Procedure and applicable professional ethical precepts.

## POINT II

**THE PROPOSED CLASS REPRESENTATIVES CANNOT
SATISFY THE ADEQUACY OF REPRESENTATION
STANDARD OF FED. R. CIV. P. 23(A)(4) BECAUSE THEIR
ECONOMIC INTERESTS AND OBJECTIVES
SUBSTANTIALLY CONFLICT WITH MOST ABSENT
CLASS MEMBERS. CONSEQUENTLY THE
SETTLEMENT CLASS CANNOT BE CERTIFIED**

The only money Horizon is willing to pay as part of the proposed settlement, other than the $2.5 million requested by Mr. Nagel for attorneys' fees and expenses, is $20,000 to proposed class representative Cathleen McDonough and $15,000 to proposed class representative New Jersey Psychological Association.[9] Mr. Nagel makes no attempt to reconcile why the proposed class representatives are getting paid while 3 million others get nothing other than a "business reform" that will actually result in significantly greater expense to the Class if this settlement were approved.

In addition, other than offering boilerplate lip service mimicking the adequacy requirements of Rule 23 in their preliminary approval submission, the settling parties simply have not demonstrated that a psychologist (Dr. Helfmann) could adequately represent and protect the interests of a "Provider" Class that, according to the Settlement Agreement includes "without limitation" no less than 33 different types of specialties encompassing every conceivable ONET healthcare and ancillary provider profession.[10] This Court may take practical notice that psychologists bill relatively low hourly rates for their professional services compared to, just by

---

[9]    Apparently Mr. Nagel is not seeking any money for psychologist Barry Helfmann, Psy.D.

[10]    Mr. Nagel also makes no effort to explain how an associational plaintiff (New Jersey Psychological Association) could possibly have standing to represent the interests of its own members, let alone dozens of provider specialties completely unrelated to psychology that comprise the "Provider" Class. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1997) (setting forth prerequisites for associational standing).

14

way of example, durable medical equipment providers that bill in the many thousands if not tens of thousands of dollars for, among other things, various types of beds, chairs, power mobility devices, patient lifts, traction equipment, orthotics, artificial limbs and so on.  Similarly, oral surgeons, podiatric surgeons and orthodontists bill for complex and expensive surgical or related procedures that far exceed the hourly billables of psychologists.  In other words, the greater percentage -- if not the lion's share -- of the $10 billion in damages would be released by the absent Class Member ONET provider specialties that are not adequately represented by the proposed class representatives in this case.  In short, because the economic divergence and utter disconnect between the proposed class representatives and the 3 million absent Class Members is cavernous the proposed class representatives cannot satisfy Rule 23(a)(4).

In making a determination whether to certify a class for settlement purposes under Fed. R. Civ. P. 23, the central inquiry is the adequacy of the class representation.  In re Cmty. Bank of N. Va., 418 F.3d 277, 300 (3d Cir. 2005) ("Cmty. Bank I").  "Although it is not necessary for the putative class representatives' claims to be identical to those of absent class members, due process precludes certification if the named plaintiffs possess potentially conflicting interests that may impair vigorous prosecution of the class claims. . . .  Where class members have conflicting interests, each group must receive its own representation . . . ."  In re Prudential, supra, 962 F. Supp. at 520.

"Special obligations attend when a class is certified for settlement purposes only."  In re CertainTeed Corp. Roofing Shingles Prods. Liab. Litig., 269 F.R.D. 468, 477 (E.D. Pa. 2010) (quoting Amchem, supra, 521 U.S. at 620).  Adequacy is especially important in classes certified for settlement purposes because "collusion, inadequate prosecution and attorney inexperience are the paramount concerns in precertification settlements."  Gen. Motors, supra, 55 F.3d at 795

(citing Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968)).   Accordingly, as addressed earlier, a heightened standard applies to the approval process.  In re Warfarin, supra, 391 F.3d at 534.

In Jackson v. Southeastern Pennsylvania Transportation Authority, 260 F.R.D. 168, 192 (E.D. Pa. 2009), the Eastern District of Pennsylvania stated, in pertinent part, that adequacy "considers whether the named plaintiff's interests are sufficiently aligned with those of the absentee members and serves to uncover conflicts of interest." (Citing Gen. Motors, supra, 55 F.3d at 800).  In determining the adequacy of representation by a named plaintiff, the Third Circuit has stated that "the plaintiff must not have interests antagonistic to those of the class." Wilson v. County of Gloucester, 256 F.R.D. 479, 487-88 (D.N.J. 2009) (quoting Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)).  "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class."  Dewey v. Volkswagen Aktiengesellschaft, 681 F.3d 170, 183 (3d Cir. 2012) (collecting authority).

In Schwartz v. Dana Corp., 196 F.R.D. 275, 281 (E.D. Pa. 2000), the Eastern District of Pennsylvania additionally explained that: "A named plaintiff cannot be an adequate class representative where he or she has different claims and/or circumstances than other members, thereby creating the possibility of a less than vigorous advancement of the case for all plaintiffs involved." (Citation omitted).  Rule 23(a)(4) precludes class certification where the "economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class members." Valley Drug Co. v. Geneva Pharms., Inc., 350 F.3d 1181, 1190 (11th Cir. 2003).  See also Allen v. Holiday Univ., 249 F.R.D. 166, 182 (E.D. Pa. 2008) ("Conflicts between class members based on their respective relationships to the

defendant are relevant . . . when the class representatives' economic interest and objectives substantially conflict with those of absent class members.").

Here, as addressed above, the variance in economic interests and objectives of the proposed class representatives and most other absent Class Members is pervasive.   While psychologists are likely releasing relatively small amounts of underpayments, durable equipment providers, surgical specialties, physician assistants and surgical assistants are releasing significantly greater sums.   There is little if any alignment of interests between the class representatives and most absent Class Members because of the obvious varying types of claims and circumstances that impact the many provider specialties in unique ways.   Put another way, trying to group together several dozens of different healthcare professional specialties in this particular case is akin to grouping together apples and oranges.   Finally, neither Mr. Nagel nor Horizon has presented anything to this Court attempting to explain how the proposed representatives could adequately represent such divergent groups and interests.   Accordingly, the Class should not be certified for settlement purposes.

**POINT III**

**THE REQUIREMENTS OF <u>FED. R. CIV. P.</u> 23(B)(3) TO
CERTIFY A CLASS ON PLAINTIFFS' ERISA CLAIMS
ARE DEMANDING, EVEN FOR SETTLEMENT
APPROVAL, AND CANNOT BE SATISFIED HERE**

The <u>McDonough/Helfmann</u> Settlement Class cannot be certified under Rule 23(b)(3) as to the ERISA claims that are central to these actions unless the settling parties can demonstrate that there are "questions of law or fact common to the class" and that such questions "predominate over any questions affecting only individual members." <u>Fed. R. Civ. P.</u> 23(a)(2) and (b)(3). Here the core claims lack a "common" question, let alone meet the stringent "predominance" requirement, because this Court has already held that "it is not enough to establish that Ingenix was invalid to determine UCR" and where damages arise from UCR disputes, there is no "common questions as to the measure of damages [that] will predominate over individual issues." <u>Franco v. Conn. Gen. Life Ins. Co.</u>, 289 <u>F.R.D.</u> 121, 136-37 (D.N.J. 2013) (Chesler, J.).

A party seeking class certification must affirmatively demonstrate [its] compliance with the Rule . . . ." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 <u>S. Ct.</u> 2541, 2551 (2011). The Court's <u>Dukes</u> decision clearly raised the bar for establishing a "common question" under Rule 23(a)(2) and (b)(3). <u>See</u> <u>McDonough v. Toys "R" Us, Inc.</u>, 834 <u>F. Supp.</u> 2d 329, 338 (E.D. Pa. 2011). A question of law or fact is "common" only if it: (1) is a "common contention" upon which the claims of all putative Class Members depend, <u>Dukes</u>, <u>supra</u>, 131 <u>S. Ct.</u> at 2551; (2) is capable of class-wide resolution, "which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke," <u>id.</u>; and (3) is supported by "convincing proof," <u>id.</u> at 2556. <u>See also</u> <u>id.</u> at 2551 ("What matters to class certification . . . is not the raising of common 'questions' -- even in droves but, rather the capacity of a classwide

18

proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation" (emphasis in original and citation omitted)).  Also fundamental for class certification is that this Court "must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits -- including disputes touching on elements of the cause of action." <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 <u>F.</u>3d 305, 307 (3d Cir. 2008).

Significantly, this Court's Rule 23 analysis is largely the same whether it is deciding to certify a litigation or settlement class:

> Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . . for the proposal is that there would be no trial.  **But other specifications of the Rule -- those designed to protect absentees by blocking unwarranted overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context.**

> [<u>Amchem</u>, <u>supra</u>, 521 <u>U.S.</u> at 620 (emphasis added).]

In the case at bar, and applying the applicable heightened standard, this Court should not certify a settlement class because "predominance" cannot be satisfied and the proposed definition of the Class is fatally overbroad.

In <u>Franco</u>, <u>supra</u>, this Court when faced with a substantially similar class action seeking to certify a Rule 23(b)(3) class, denied a motion for class certification on "predominance" grounds that, in part, had nothing to do with manageability.  These very same "predominance" defects plague the proposed certification of the <u>McDonough/Helfmann</u> Settlement Class.  Specifically, in denying class certification as to ERISA liability, the Court found:

> The problems with evaluating the ERISA claims on a classwide basis are amplified by the standard of review the Court must apply in reviewing the allegedly unlawful ONET benefits determinations.  Assuming that the Subscriber Plaintiffs could overcome the foregoing impediment to manageability by, for example, defining the ERISA class with respect to particular plan language and/or creating subclasses to address variations in UCR definitions, the Court is still left with the question of how Subscriber Plaintiffs could establish abuse of discretion

based on common evidence. For the ERISA class to prove its claim to recover unpaid benefits and/or enforce plan terms, it is not enough to establish that Ingenix was invalid to determine UCR as described in the plans. . . . The abuse of discretion inquiry . . . . is a multi-factored one, dependent upon the fact and circumstances of each case and benefits determination.

* * *

Subscriber Plaintiffs have not addressed in their motion for class certification how they proposed to establish a critical liability question -- did Cigna's use of Ingenix constitute an abuse of discretion -- on a classwide basis.

[Franco, supra, 289 F.R.D. at 136 (Chesler, J.).]

The Court then discussed the difficulties of establishing ERISA damages in a Rule 23(b)(3) class:

In addition to these impediments, the ERISA class suffers from another glaring deficiency preventing certification under Rule 23(b)(3): Subscriber Plaintiffs have not demonstrated that each class member's recovery could be adjudicated on a classwide basis. Even if they could establish that all putative ERISA class members have been affected by the same allegedly wrongful conduct -- Cigna's use of Ingenix in an abuse of its plan discretion -- based on common proof, Subscriber Plaintiffs have not shown that common questions as to the measure of damages will predominate over individual issues.

[Id. at 137].

In the case at bar, the challenges in certifying a Rule 23(b)(3) class, both as to class-wide ERISA liability and damages, are equally problematic. These are not solely manageability issues; they are matters this Court has to consider when analyzing "predominance" for purposes of settlement as well. Furthermore, the definitions of the two proposed classes of "Subscribers" and "Providers" lack cohesion and are at odds with one another. Specifically, as addressed throughout this brief, the definition of the "Subscriber" Class is overbroad and includes services rendered by medical doctors and osteopathic physicians that are not part of the "Provider" Class.

It is telling that the settling parties were already aware at the preliminary approval stage that the proposed class certification was built on a house of cards. During the December 4, 2013 hearing for preliminary approval the following colloquy took place with the Court:

> MR. NAGEL: . . . And we're seeking approval today at least on 23(b)(3) ground because the relief sought was initially the reimbursement of the under payments owed to the subscribers -- well, I should say derivatively to the subscribers because the under payments would have gone to the provider and then derivatively the subscriber would have been put in a position of having to pay balance bill or being exposed to that.
>
> So, to the extent that those issues deal with monetary issues and a waiver of monetary issues, it's critically important for all class members to have opt out rights and the 23(b)(3) is absolutely essential to this deal.
>
> * * *
>
> And second, that a condition precedent to the effectiveness of the settlement agreements is the approval by the Court at the final hearing of a class certified under 23(b)(3). . . .
>
> THE COURT: In other words, just so I understand clearly, if for some reason I concluded that a (b)(3) class not be certified, then your agreement with the plaintiffs in this case in that the settlement would not go into effect.
>
> MR. SELLINGER: Correct.
>
> THE COURT: Okay. Is that correct, Mr. Nagel?
>
> MR. NAGEL: It is.
>
> [Transcript of Settlement Agreement for Preliminary Approval, dated December 4, 2013, at 5:19 to 7:18, attached as Exhibit "A" to the Document Identifying Certification of Eric D. Katz ("Katz Cert.")].

In sum, because the settling parties cannot certify a Rule 23(b)(3) settlement class, any need to further analyze the fairness and reasonableness of the proposed settlement has been rendered moot.

**POINT IV**

**THE COURT SHOULD REJECT THE PROPOSED SETTLEMENT BECAUSE IT PROVIDES NO BENEFITS TO CLASS MEMBERS. UNDER THE PROPOSED SETTLEMENT 3 MILLION CLASS MEMBERS ARE RELEASING $10 BILLION IN CLAIMS FOR $0 AND A "BUSINESS REFORM" THAT WILL EXPOSE THEM TO SIGNIFICANTLY GREATER OUT-OF-NETWORK COSTS AND HIGHER BALANCE BILLS FOR ONET SERVICES[11]**

**A.     The Court has a Duty to Protect Absent Class Members from an Unfair Settlement**

Delaying class certification until the settlement approval stage increases the "principal dangers of collusion." Sullivan v. DB Invs., Inc., 667 F.3d 273, 336-37 (3d Cir. 2011). Consequently, as noted earlier, the analysis of a proposed settlement such as the one before this Court requires "heightened attention." Amchem, supra, 521 U.S. at 620.

As this Court is aware, a "district court ha[s] a fiduciary responsibility to the silent class members." Grant v. Bethlehem Steel Corp., 823 F.2d 20, 13 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." Mirfasihi v. Fleet Mortgage Corp., 356 F.3d 781, 785 (7th Cir. 2004). "These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when [as here] the class receives no monetary distribution but class counsel are amply rewarded." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1021 (9th Cir. 1998). Accord Staton v. Boeing Co., 327 F.3d 938, 964 (9th Cir. 2003) ("If fees are unreasonably high, the likelihood is that the defendant

---

[11]     The remaining legal arguments set forth in this brief are relevant if the Court determines that a settlement class may be certified.

obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained.").

**B.**     **The Proposed Settlement Does Not Fall Within the "Range of Reasonableness"**

It is axiomatic in the Third Circuit that a proposed settlement may only be approved if it satisfies the criteria set forth in Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975), as supplemented by In re Prudential Insurance Co. of America Sales Practice Litigation, 148 F.3d 283, 323 (3d Cir. 1998), cert. denied, 525 U.S. 1114 (1999).  Critical is whether the proposed settlement is within the "range of reasonableness." In re Pet Foods Prods. Liab. Litig., 629 F.3d 333, 354-55 (3d Cir. 2010); Girsh, supra, 521 F.2d at 156-57.

In Pet Foods, the Third Circuit rejected and remanded a settlement that was approved by the district court because the settling parties did not provide the necessary information to allow the court to evaluate the "reasonableness" of the proposed settlement:

> We have explained that "in cases primarily seeking monetary relief," district courts should compare "the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing . . . with the amount of the proposed settlement. . . . "This figure should generate a range of reasonableness (based on size of the proposed award and the uncertainty inherent in these estimates) within which a district court approving (or rejecting) a settlement will not be set aside. . . .
>
> If available, this information would have enabled the court to make **the required value comparisons and generate a range of reasonableness to determine the adequacy of the settlement amount**.
>
> [Pet Foods, supra, 629 F.3d at 354-356 (emphasis added and citations omitted).]

In the case at bar, 3 million absent Class Members get $0 in consideration for the release of $10 billion in damages.  No report has been provided to the Court by the settling parties valuing the supposed non-monetary settlement benefit.  Thus, "the required value comparisons"

cannot be made and the Court is compelled to reject the settlement as inadequate and unreasonable.  In fact, as we have addressed throughout this brief, if the settlement were approved, the "Subscriber" Class would be exposed to even greater out-of-pocket expenses for ONET care and substantial balance bills from ONET providers.  Settlement approval is simply not warranted here and the Court has not been presented with any evidence from which to conclude otherwise.

**C.      The Proposed Settlement Benefits are Illusory and Have No Value to the Class**

As addressed throughout this brief, the proposed settlement only hurts and offers no value to the Class.  For the release of $10 billion in underpaid services for past ONET claims submitted by 3 million absent Class Members, the Class only receives a business practice change -- that Horizon was implementing regardless -- that will result in even greater underpayment of future ONET claims and lead to far more significant out-of-pocket costs to Class Members that seek treatment from ONET providers.   The settlement also includes an overbroad Release that directly and negatively impacts Class Member providers that opt-out and Non-Class Member physicians whose assignment rights are being revoked by the Class Member subscribers they treated.  This in turn will result in subscribers being saddled with huge balance bills.  On top of all that, Mr. Nagel leveraged the rights of the 3 million absent Class Members in order to protect a few ambulatory surgical centers that he also represents in a competing class action against Horizon, cunningly designed to pocket two multi-million dollar fees.  In short, the settlement is illusory and should not be approved.

"A district court may deny final approval for a settlement in a variety of situations, including where 'class members [receive] illusory nonmonetary benefits' . . . ."  Ehrheart v. Verizon Wireless, 609 F.3d 590, 604 (3d Cir. 2010) (quoting Manual for Complex Litigation,

Fourth, § 21.61 (2004)).  See Gen. Motors, supra, 55 F.3d at 812–13 (noting the danger of approving a settlement where the "fiduciary responsibilities of class counsel or class representatives may have been compromised," slanting the benefits in favor of class counsel and away from the absent plaintiffs).  See also Schreiber v. Kellogg, 50 F.3d 264, 278 n.33 (3d Cir. 1995) (benefits must be real even if they are not pecuniary).

**D.    Horizon was Replacing Ingenix with Medicare Regardless of this Settlement**

The Ingenix database has been a "dead man walking" for several years prior to the filing of this action and its proposed settlement.  Indeed, Mr. Nagel's own expert chronicles the historical demise of Ingenix in her report.  See Report of Sally Reaves (D.E. 249-3), at 3-5 ("The New York Attorney General sued Ingenix over flaws in the Ingenix methodology for gathering and massaging the payer claims data. . . .   The Attorney General's investigation concluded in several settlements with a number of reforms to be implemented.").[12]

To briefly recap:  Beginning in 2007 and 2008, prior to the filing of this lawsuit, then Attorney General Andrew M. Cuomo initiated an industry-wide investigation into allegations that health insurers unfairly saddled consumers with too much ONET care costs.  Mr. Cuomo's investigation uncovered that Ingenix intentionally skewed UCR rates downward through faulty data collection, poor pooling procedures, and the lack of audits.  After more than a year-long investigation, in his January 23, 2009 *Health Care Report: The Consumer Reimbursement*

---

[12]    It is clear that Horizon's use of the flawed Ingenix database is central to this litigation. Horizon's use of another UCR database, called Top of Range ("TOR") was only used in a relatively small percentage of ONET claims.  In any event, according to Mr. Nagel's expert, Sally Reaves, "the TOR database was wrought with many of the flawed methodologies found in the construction of the [Ingenix] data . . . ." (D.E. 249-3, at 6-7).  Consequently, throughout this objection when referring to the UCR databases we collectively refer to them as "Ingenix."

*System is Code Blue*,[13] attached as Exhibit "B" to Katz Cert., Attorney General Cuomo concluded that "[t]he structure of the out-of-network reimbursement system is broken. The system that is meant to reimburse consumers fairly as a reflection of the market is instead wholly owned and operated by the industry." Specifically, the Attorney General found that "United-Health has a conflict of interest in owning and operating the Ingenix Database in connection with determining reimbursement rates." Moreover, the Attorney General concluded that, "other health insurers have a financial incentive to manipulate the data they provide to the Ingenix database so that the pooled data will skew reimbursement rates downwards." According to Mr. Cuomo, a health insurer cannot fairly determine market rates that the insurer knows it will be obligated to use as a basis for reimbursing consumers. The investigation found the rate of underpayment by insurers ranged as high as 28% for various ONET medical services.

Consequently, in January 2009, UnitedHealth Group entered an agreement with Mr. Cuomo, entitled Assurance of Discontinuance Under Executive Law §63(15) to shut down the Ingenix database and pay $50 million toward establishing an independent body to set fair market reimbursement rates for ONET Care. That new database ultimately became FAIR Health. In order to fund the FAIR Health database, several insurers paid over $100 million to the State of New York. <u>See</u> Horizon "Brief Notes," Vol. 22 No. 937, dated September 25, 2013, attached as Exhibit "C" to Katz. Cert. ("FAIR Health was formed to take over and improve the charge-based profile, developed by Ingenix . . . ."). <u>See also</u> Comm. on Commerce, Science & Transp., 111th

---

[13]      Available at <u>http://www.ag.ny.gov/sites/default/files/pdfs/bureaus/health_care/FINAL HITIngenixReportJan.13,%202009.pdf</u>.

Cong., *Underpayment to Consumers by the Health Insurance Industry*, Staff Report for Chairman Rockefeller (June 24, 2009), attached as Exhibit "D" to Katz Cert.[14]

It is a matter of public record that several Ingenix-related class action lawsuits ensued, both in this District and around the country.  One such case, McCoy v. Health Net, Inc., 569 F. Supp. 2d 448 (D.N.J. 2008), resulted in a 2007 settlement that included a $215 million fund out of which class members were entitled to make claims.  In addition, Health Net agreed to cease using and maintaining the Ingenix database.  In 2009, UnitedHealth agreed to pay $350 million to resolve a class action lawsuit filed by providers, subscribers and the American Medical Association in the Southern District of New York.  See Am. Med. Assoc. v. United HealthCare Corp., 588 F. Supp. 2d 432 (S.D.N.Y. 2008).  In 2013 in this District, a multi-district litigation captioned In re Aetna UCR Litigation, MDL No. 2020, Dkt. No. 07-cv-3541, preliminarily settled, providing for a $120 million settlement fund to compensate class members for inadequate Ingenix payments.  In short, while the insurance industry as a whole has forked over close to $1 billion to class member victims as compensation for underpaid Ingenix claims, Mr. Nagel negotiated a settlement that pays $0.

Significantly, irrespective of this litigation (let alone the proposed settlement), Horizon had for years intended to discontinue its use of Ingenix on a voluntary basis and always planned to replace Ingenix with Medicare.  As early as April 23, 2009, Horizon's President and CEO, William J. Marino, in a letter responding to an inquiry from Senator John D. Rockefeller, IV, unequivocally represented that:

> Horizon BCBS NJ recognizes the need to move from the Ingenix databases.  Our preferred approach to out-of-network benefits is to pay based on some multiple of Medicare's payment.

---

[14]     Available at http://www.cascacolorado.com/wp-content/uploads/2009/06/62409 UnderpaymentstoConsumersbytheHealthInsuranceIndustryReport.pdf.

[See Letter from Horizon's President/CEO William J. Marino to Sen. John D. Rockefeller, IV, dated April 23, 2009 at 3, attached as Exhibit "E" to Katz's Cert.]

Once the State of New York forced the shutdown of Ingenix in 2009, the industry's discontinuance of the use of Ingenix became *fait accompli* and it was just a matter of time before Ingenix was entirely phased out.   See Emily Berry, *Ingenix name retired as United re-brands subsidiaries*, AMERICAN MEDICAL NEWS, April 26, 2011 ("Ingenix was forced to shutter [its ONET fee] business after an investigation by and subsequent settlement with the New York attorney general's office.   Cuomo ordered Ingenix to stop producing the database as soon as a new, independently derived and operated database could be created.   That new database, FAIR Health, is now operational and has replaced the [Ingenix] products.") (attached as Exhibit "F" to Katz Cert.).[15]

Subsequently, in or around August 2013, the New Jersey Department of Banking and Insurance recognized that the Ingenix database had ceased to function, concurring with a comment made as part of the process to readopt with amendments N.J.A.C. 11:3 that addresses the manner by which New Jersey No-Fault benefits, commonly known as PIP benefits, are paid:

> COMMENT:   . . . Another commenter expressly supported the proposed amendment to N.J.A.C. 11:3-29.4(e)(1) to remove Ingenix from the listed databases that are appropriate to calculate "usual, customary and reasonable (UCR) PIP fees as **Ingenix is no longer collecting data**.
>
> The Department appreciates the support of its proposal.
>
> [46 N.J.R. 1(1) (January 6, 2014) (emphasis added).]

As a result, N.J.A.C. 11:3-29.4(e)(1) was amended so that "(e)1, deleted 'Ingenix (www.ingenixonline.com)'. . . ." See Editor's Note to N.J.A.C. 11:3-29.4(e)(1).

---

[15]     Available at http://www.amednews.com/article/20110426/business/304269998/8/.

Finally, on September 25, 2013, Horizon in its "broker and consultant" newsletter called "Brief Notes" advised of "out-of-network reimbursement structure changes" to take effect as of January 1, 2014 -- corresponding to what would become the implementation date of the settlement "benefit" according to the Settlement Agreement.   According to the newsletter Horizon was voluntarily terminating its use of Ingenix and replacing it with primarily Medicare-based fees because Ingenix **"is no longer available."**  See "Brief Notes," Vol. 22 No. 937, dated September 25, 2013, attached as Exhibit "C" to Katz. Cert. (emphasis added).[16]

In sum, it was always Horizon's intention to replace Ingenix with Medicare and once Ingenix was shuttered and new ONET fee data was no longer available Horizon implemented the business practice change.  Horizon's decision to do so was not driven by this class action.  It was propelled by Mr. Cuomo's investigation and findings, numerous other lawsuits and, ultimately because Medicare pays even less fees than Ingenix does, thus skyrocketing the out-of-pocket costs to subscribers' for ONET care.  Put simply, Horizon alone benefits from the "business reform" of the proposed settlement.

**E.     Horizon's Replacement of Ingenix with Medicare Significantly Damages the Class**

It is puzzling that Mr. Nagel would settle a class action where the sole benefit is Horizon's agreement to stop doing one thing, without negotiating an agreement as to what Horizon will be doing in its place and whether the new method is better (or worse) that the old method.  As we addressed above, while the proposed settlement is silent as to what follows after

---

[16]     In subsequent "Brief Notes," Horizon advised selected "customers" that while FAIR Health may be available for certain products, Medicare-based fees was the recommended ONET payment methodology because FAIR Health "includes charges that are excessive, which can increase the overall cost of healthcare [because] it translates into higher reimbursement rates to providers."  On the other hand, Medicare is "more cost effective . . . for the group customer" although it will increase subscriber out-of-pocket costs.  See Horizon "Brief Notes," Vol. 23 No. 968, dated February 11, 2014; Horizon "Brief Notes," Vol. 23 No. 969, dated February 11, 2014, attached as Exhibits "G" and "H" to Katz. Cert.

Ingenix, it was already determined by Horizon that it will be using Medicare fees as the primary basis to calculate ONET payments going forward. **Strikingly, Mr. Nagel's own experts fully recognized and opined that the replacement of Ingenix with Medicare would significantly damage the 3 million absent Class Members**:

> Some payers rely on Medicare fee schedules as basis for determining the prevailing rates. However, the Medicare fee schedules do not include non-covered services such as maternity or preventive services. Also, the relative value scale developed for the Medicare population may not accurately reflect the relative value of the efforts required for the same services in a younger population or on a workers' compensation population. Therefore a need exists for a U&C database with a broader array of health care services and data relevant to younger insured populations than the Medicare fee schedules.
>
>                        \*   \*   \*
>
> Shorting reimbursement to the Provider class also adversely affects the Subscriber class, artificially increasing the amount balance billed to the patient.
>
> [September 16, 2011 Report of Sally Reaves (D.E. 249-3) at 3, 7).]

Horizon's other expert, Bernard R. Siskin, Ph.D. concurred:

> I have been asked by [Mr. Nagel] to opine on whether the Ingenix database can be used to determine an amount which is often charged for a given service by a provider within the same geographic area. I also was asked to opine on whether, in the alternative, the Medicare payment schedule could be used to make such a determination.
>
>                        \*   \*   \*
>
> Medicare payments do not purport to represent the "most often" charges for a given service by a provider, nor the usual and prevailing payment made to providers (other than by Medicare). Rather they are cost based fees for reimbursement.
>
> [September 16, 2011 Expert Report of Bernard R. Siskin, Ph.D. (D.E. 248-3), at 3, 9.]

One of the nation's leading actuarial firms, Milliman, issued a "White Paper" in February 2012 also confirming the flaws in the Medicare-based methodology and that Medicare

significantly exposes subscribers to greater liability because providers who render services to

their patients will be paid substantially less:

> The differences in reimbursement levels between fee schedules based on
> Medicare . . . and benchmark data based on prevailing charges such as the data
> modules made available by FAIR Health have led to some unexpected results for
> both members and physicians. These unexpected results still exist even if the
> change is designed to produce similar levels of aggregate reimbursement under
> both methods.

> \* \* \*

> [A] change in the basis for determining out-of-network reimbursement may
> change the health plan member's out-of-pocket expenses significantly.

> [Kahn & Parke, *Using Medicare RBRVS for reimbursing out-of-network claims in
> commercial insurance*, MILLIMAN WHITE PAPER (Feb. 2012), at 1, 4, attached as
> Exhibit "I" to Katz Cert.].[17] [18]

On May 7, 2012, the New York State Department of Financial Services issued a report

entitled *An Unwelcome Surprise:  How New Yorkers are Getting Stuck with Unexpected Medical

Bills from Out-of-Network Providers*, concluding:

> The use of the Medicare fee schedule instead of the FAIR Health database lowers
> the overall out-of-network reimbursement to consumers. Indeed, all insurers that
> use the Medicare fee schedule reported that the Medicare fee schedule resulted in
> lower reimbursements as compared to UCR based on the FAIR Health database.
> One insurer stated that the reimbursement could be as much as 25% lower under
> the Medicare fee schedule.

> [See New York State Dept. of Fin. Servs., *An Unwelcome Surprise:  How New
> Yorkers are Getting Struck with Unexpected Medical Bills From Out-of-Network
> Providers* (March 7, 2012), at 30, attached as Exhibit "J" to the Katz Cert.][19]

---

[17]     Available at http://publications.milliman.com/publications/health-published/pdfs/using-medicare-rbrvs.pdf.

[18]     Interestingly, one of Milliman's important clients is Horizon.

[19]     Available at http://www.governor.ny.gov/assets/documents/DFS%20Report.pdf.

Finally, national media has consistently reported that the switch by health insurers from UCR databases (such as Ingenix or FAIR Health) to Medicare-based fees has resulted in greater out-of-pocket expenses to subscribers that seek treatment from ONET providers.   E.g., Julia Applebee, *Medical bills hold nasty surprises: Price of going out-of-network has gone way up for many*, USA TODAY, Feb. 9, 2012, at 5(B)[20]; Nina Bernstein, *Insurers Alter Cost Formula; Patients Pay*, NY TIMES, April 24, 2012, at A1[21]; John Carroll, *Reformed UCR Calculations Not Without Problems*, MANAGED CARE MAGAZINE ONLINE, June 2012.[22]

In sum, the proposed settlement offers zero benefits to the Class.  Equally important, the sole "benefit" provided to 3 million Class Members -- the replacement of Ingenix -- will result in substantially greater out-of-pocket costs and higher balance bills for ONET services.   The proposed settlement should therefore be rejected by the Court.

---

[20]     Available   at   http://usatoday30.usatoday.com/MONEY/usaedition/2012-02-09-Medical-Bills_ST_U.htm.

[21]     Available    at    http://www.nytimes.com/2012/04/24/nyregion/health-insurers-switch-baseline-for-out-of-network-charges.html?pagewanted=all&_r=0.

[22]     Available at http://www.managedcaremag.com/archives/1206/1206.outnet.html.

## POINT V

**THE PROPOSED SETTLEMENT RELEASE IS GROSSLY OVERBROAD, CONTRAVENES NEW JERSEY LAW AND FATALLY PREJUDICES THE RIGHTS OF BOTH CLASS MEMBERS AND NON-CLASS MEMBERS ALIKE[23]**

The Court should also reject the proposed settlement because the Release, see ¶ 7 of the Settlement Agreement, is grossly overbroad and clearly violates New Jersey law. Specifically, ¶ 7.2(a)(ii) requires "Subscriber" Class Members to revoke every assignment of benefits previously given to any provider. Not only does this provision contravene well-settled contract law that "the assignor retains no power to revoke to the assignment," MHA, LLC v. Aetna Health, Inc., 2013 WL 705612, at *7 (D.N.J. Feb 25, 2013) (Chesler, J.), its impact on the healthcare system would be ruinous.

Specifically, if this Court were to allow ¶ 7.2(a)(ii) to stand, millions of "Subscriber" Class Members would be revoking the assignments they gave to any "Provider" Class Members that choose to opt-out of the settlement as well as thousands of Non-Class Member physicians and physician groups. This, in turn, would compel all of the affected "Provider" Class opt-outs and Non-Class Member physicians to pursue their patients (i.e. the subscribers) for payment of the ONET services they rendered because the providers would no longer have any recourse against Horizon. In the case of surgeons in particular those bills could be astronomical and range in the tens if not hundreds of thousands of dollars for specific surgical procedures.

This is not rocket science. Unless the "Subscriber" Class Member treated by a particular "Provider" Class Member both opt-out of the settlement, the provider that opts-out loses his/her assignment rights. Moreover, because the plain reading of the definition of the "Subscriber"

---

[23]    Several Non-Class Member Objectors we represent have today filed a companion motion to intervene in this action to challenge, inter alia, the legality of the proposed settlement Release.

Class is far broader than the definition of the "Provider" Class, subscribers are indisputably releasing the rights of non-Class Member physicians from whom they received ONET services.[24]

As this Court made clear in MHA, supra, 2013 WL 705612, at *7:

A valid assignment transfers the whole of the interest in the right. Only an assignment that clearly reflects the assignor's intent to transfer his rights will be effective. Moreover [f]or an assignment to be created [under New Jersey law], the effect must be that the assignor retains no power to revoke to the assignment. In other words, as a result of a valid assignment, the assignor loses all control over the subject matter of the assignment and all interest in the right assigned.

The Release further violates the due process rights of medical doctors and osteopathic physicians because it releases the right to payments belonging to these Non-Class Members for services rendered by "Provider" Class Members such as, by way of example only, "physician assistants," "surgical assistants," "nurses" and "nurse practitioners." The services that these supporting providers rendered were under the direction of the medical doctors and osteopathic physicians that employed them and, consequently, the payments for such services belong to the medical doctors and osteopathic physicians and cannot be released as part of the proposed settlement.

Accordingly, the Release should not be approved.

---

[24] See Class Notice, attached as Exhibit "K" to Katz Cert., where the definition of "Provider" expressly carves out "licensed medical doctors or doctors of osteopathy," while the definition of "Subscriber" includes these excluded providers.

## POINT VI

## THE PROPOSED RELEASE OF DENTIST PROVIDER CLAIMS CONSTITUTES A BREACH OF CONTRACT BY HORIZON AND ITS SETTLEMENT AGREEMENT IN THE KIRSCH CLASS ACTION

On July 23, 2012, the Hon. Paul J. Vichness, J.S.C. (Ret.) of the Essex County Superior Court granted final approval to the Kirsch settlement of two consolidated class actions brought against Horizon by approximately 17,000 participating and ONET dentists and dentist groups pertaining to Horizon's late payment and underpayment of dental services during a class period of May 26, 1999 through April 13, 2012.   The Kirsch Class consists of all dental specialties, including oral surgeons and orthodontists.   There were fourteen opt-outs, some of which are ONET providers.   The settlement provides cash payments to dentists and the implementation of several business reforms designed to significantly reduce administrative overhead.   See Final Approval Order, Kirsch, D.D.S. v. Horizon Blue Cross Blue Shield of New Jersey, Essex County Superior Ct. Dkt. Nos. ESX-L-4216-05, L-109-08, attached as Exhibit "L" to Katz Cert.[25] Should this Court grant final approval to the proposed McDonough/Helfmann settlement, Horizon would then be in clear breach of its settlement agreement with the Kirsch Class.

Specifically, as part of the Kirsch settlement, the Kirsch Class and Horizon agreed that certain claims for payment were expressly preserved.   These preserved claims, defined as "Retained Claims" in ¶ 13.1(c) of that agreement, are those claims for payment that the Kirsch Class has not released as part of that settlement because they are for services rendered to subscribers prior to the "Effective Date" of the agreement, and (1) not yet submitted to Horizon

---

[25]     The Kirsch final approval Order was subsequently affirmed by the Appellate Division in Kirsch v. Horizon Blue Cross Blue Shield of New Jersey, 2013 WL 5507660 (App. Div. Oct 7, 2013).   The only two objectors to that settlement approval, both of whom are represented by Mr. Nagel, have since petitioned the New Jersey Supreme Court and that petition for certification is pending.

for payment or (2) already submitted but not yet finally adjudicated by Horizon through the entire internal appeal process. "Effective Date" is defined in the agreement at ¶ 14 as the "next business day" following the disposition of all appellate rights. Critically, the Kirsch "Effective Date" has not yet occurred because, ironically, Mr. Nagel's petition to the New Jersey Supreme Court has prevented final closure of that settlement. What this means is that as part of the settlement, all Kirsch Class Members -- including ONET dentists, orthodontists, oral surgeons etc. -- that are also members of the proposed McDonough/Helfmann Class have "live" claims against Horizon for payment and/or underpayment of dental services that are expressly **protected** by the Kirsch settlement through final adjudication. These "Retained Claims" cannot be contractually released through the proposed settlement of this action.

In addition, because some of the Kirsch opt-outs are ONET providers that are also members of the proposed McDonough/Helfmann Class in a largely overlapping class period, Horizon should not be able to extinguish the rights of Kirsch ONET opt-outs by releasing the claims of these providers as part of the McDonough/Helfmann Class without fully advising these dentists of the ramifications of failing to opt-out of the present settlement. It is not reasonable to assume that the Kirsch ONET opt-outs, all of whom already took timely and appropriate steps to protect their rights to pursue Horizon individually as part of the Kirsch settlement only about one and a half years ago, would understand the need to opt-out a second time absent very explicit language in the Class Notice advising them of what they must do to continue to preserve their rights. There is no such language in the Class Notice and, as we discuss in Point VII, infra, this is one of the many reasons why the Class Notice is defective and does not comport with due process. More importantly, as discussed in Point V, supra, even if the Kirsch ONET opt-outs also opted-out of McDonough/Helfmann, their rights would still be released unless the

subscribers they treated also opted-out.  Either way, this Court should stop Horizon from violating the rights of these dentists.

In order to enjoin Horizon and to prevent it from breaching the <u>Kirsch</u> settlement agreement, undersigned counsel to Objectors here, in our capacity as Class Counsel in <u>Kirsch</u>, have filed a motion in the Essex County Superior Court, concurrent with filing this objection. The current return date of the motion is March 28, 2014.   <u>See</u> Motion in <u>Kirsch</u> to Enforce Settlement Agreement and Enjoin Horizon, attached as Exhibit "M" to Katz Cert.   We respectfully request that in the interests of comity this Court delay any ruling on final approval at least as the proposed settlement impacts dentist providers in order to allow the Superior Court to make its findings and rule on the motion.

**POINT VII**

**THE CLASS NOTICE IS DEFECTIVE AND DOES NOT
COMPORT WITH THE MINIMUM REQUIREMENTS OF
DUE PROCESS. THE NOTICE MUST BE
SUBSTANTIALLY REVISED AND THEN DISSEMINATED
AGAIN TO ALL ABSENT CLASS MEMBERS AND NON-
CLASS MEMBERS NEGATIVELY IMPACTED BY THE
PROPOSED SETTLEMENT**

If the Court is inclined to consider final approval of the proposed settlement, the Class

Notice purportedly mailed to 3 million absent Class Members -- and attached as Exhibit "K" to

Katz Cert. -- should first be significantly revised and mailed again not only to the 3 million Class

Members comprising the "Subscriber" and "Provider" Classes, but also to all ONET providers,

most significantly physicians, that are not class members and thus never received the Class

Notice, but whose rights are substantially and negatively impacted by the settlement Release.[26]

The current version of the Class Notice is defective and does not comport with minimum due

process requirements for several reasons, including the following:

First, the notice is silent as to the clear conflict of interest Mr. Nagel has created by his

dual representation of the McDonough/Helfmann Class and the Edwards Class. Class Members

must be fully informed about the ramifications of that dual representation, including that Mr.

Nagel has released $10 billion in their past claims while preserving the rights of the Edwards

Class to receive money, so that Class Members may make an informed decision whether to

object or opt-out of the proposed settlement. See Point I, supra.

---

[26]     It has come to our attention that some physicians have received the Class Notice.
Whether by mistake or design, this does not ameliorate the due process defect as these notices
were the same as those mailed to the Class and by their express language carve-out "medical
doctors or doctors of osteopathy" from the definition of the "Provider" Class. Consequently, any
physician that may have received the notice would most likely be confused as to why the notice
was mailed to him/her in the first place.

Second, because the settlement "benefits" do not include the identification of the replacement database Horizon is using to determine ONET payments going forward, the settling parties should be required to advise the Class how Horizon will calculate such payments and the effect that the use of Medicare (or any other database) will have on the out-of-pocket expenses and provider balance bills that "Subscriber" Class Members will incur. See Point IV(C)-(E), supra.

Third, if "Subscriber" Class Members are required to revoke assignments of benefits, notwithstanding our arguments in Point V, supra that these revocations would violate New Jersey law, the Class Notice should then explain the economic implications of that revocation and the resulting significant balance bills that the subscribers will likely receive from "Provider" Class Member opt-outs and Non-Class Member physicians whose rights are also being released due to the overbroad definition of the "Subscriber" Class. Both categories of providers would lose their rights to proceed against Horizon based on the assignments that were previously given by their patients and would therefore be compelled to seek payment for their services directly from the patients.

Fourth, the settling parties must explain to Non-Class Member physicians that "Provider" Class Members such as "physician assistants," "surgical assistants," "nurses" and "nurse practitioners," just by way of example, would be releasing the right to payment for services that these providers rendered under the direction of the physicians that employed them and, consequently, releasing payments that in actuality belong to the physicians. See Points II and V, supra.

Fifth, the settling parties must explain to affected Kirsch dental provider Class Members that previously opted out of the Kirsch class action settlement, that they must now opt-out again,

this time from the McDonough/Helfmann settlement in order to continue to preserve their rights. See Point VI, supra.

"Absent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is 'predominantly' for money damages." Hecht v. United Collection Bureau, Inc., 691 F.3d 219, 222 (2d Cir. 2012) (citing Phillips Petro. Co. v. Shutts, 472 U.S. 797, 811-12 & n.3 (1985)).

As the Phillips Court explained in its seminal holding on the notice requirement in class actions, for an absent plaintiff to be bound,

> concerning a claim for money damages or similar relief at law, [the forum state] must provide minimal procedural due process protection. The plaintiff must receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel. The notice must be the best practicable, "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane [v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314-15 (1950)]; cf. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 174-175 (1974). The notice should describe the action and the plaintiffs' rights in it. Additionally, we hold that due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an "opt out" or "request for exclusion" form to the court. Finally, the Due Process Clause of course requires that the named plaintiff at all times adequately represent the interests of the absent class members. Hansberry [v. Lee, 311 U.S. 32, 42-43 (1940)].

> [Phillips, supra, 472 U.S. at 811-12.]

For the reasons addressed above, the Class Notice should be significantly revised and re-issued. The minimum due process rights of both Class Members and impacted Non-Class Members have not been adequately protected. All of these interested parties have been denied very critical information about the proposed settlement and how the settlement, if approved, would affect their economic rights going forward.

## POINT VIII

## NO ATTORNEYS' FEES OR EXPENSES SHOULD BE AWARDED BECAUSE THERE ARE NO BENEFITS TO THE CLASS[27]

It is clear even before Mr. Nagel files his fee application that no attorneys' fees or expenses should be awarded because, as addressed throughout this brief, there are no benefits to the Class in the proposed settlement. Indeed, to the contrary, the settlement if approved would be a significant detriment to the 3 million Class Members who would be far worse off now than before because they would be: (1) releasing $10 billion in underpaid past claims; and (2) subjected to the replacement of Ingenix with Medicare fees that systemically result in lower payments to ONET providers and correspondingly higher out-of-pocket costs to subscribers that seek treatment from such providers.    As we addressed in Point IV(D)-(E), supra, not only is it well documented both in the private and public sector that Medicare is worse than Ingenix, but Mr. Nagel's own experts fully concur with this conclusion and have already opined that the use of Medicare fees will significantly harm the Class.

Mr. Nagel is not entitled to any fees regardless of whether the Court ultimately applies the lodestar method in this fee-shifting ERISA case or the common fund percentage of recovery method.  See Hardt v. Reliance Standard Life Ins. Co., 130 S. Ct. 2149, 2156 (2010) (in a fee-shifting litigation, an attorney must "show some degree of success on the merits before a court may award attorneys' fees); Gen. Motors, supra, 55 F.3d at 819 n.38 (when applying percentage of recovery method, the fee award is based on a "variable percentage of the amount recovered by the class.").  Here, there was no "degree of success" and no "amount recovered by the class."

---

[27]     Because Mr. Nagel will not be filing his fee application until March 14, 2014, Objectors by necessity must respectfully reserve their right to file a more comprehensive objection to counsel's request for attorneys' fees and expenses once we have an opportunity to review the application.

What has been presented to this Court is a settlement rife with conflict of interest caused by Mr. Nagel's breach of his fiduciary obligations when he traded the rights of 3 million Class Members in favor of a handful of ambulatory surgical centers while protecting his personal stake to receive significant fees in both cases.  Consequently, no fees or costs should be awarded.

**POINT IX**

**OBJECTORS ARE ENTITLED TO DISCOVERY BEFORE
THE FAIRNESS HEARING IS SCHEDULED**

Throughout this brief we have raised numerous objections to the proposed settlement approval. These issues require further investigation before the Court conducts a fairness hearing. Presently, we do not believe this Court -- nor certainly the 3 million absent Class Members -- has the requisite information with which to certify a settlement class, let alone grant final approval to the settlement or award fees.

Although Objectors do not have an absolute right to discovery, Cmty. Bank I, supra, 418 F.3d at 316, objectors are "entitled to an opportunity to develop a record in support of [their] contentions by means of cross-examination and argument to the court[,]" Greenfield v. Villager Indus., Inc., 483 F.2d 824, 833 (3d Cir. 1983). See In re Domestic Air Transp. Antitrust Litig., 144 F.R.D. 421, 424 (N.D. Ga. 1992) (the Court has discretion to allow "discovery or presentation of evidence to that which may assist it in determining the fairness and adequacy of the settlement[.] The criteria relevant to the court's decision of whether or not to permit discovery are the nature and amount of previous discovery, reasonable basis for the evidentiary requests, and number and interests of objectors."). "[D]iscovery may be appropriate if lead counsel has not conducted adequate discovery or if the discovery conducted by lead counsel is not made available to objectors." Id. The Court has the discretion to "'employ the procedures that it perceives will best permit it to evaluate the fairness of the settlement.'" Id. (quoting In re Prudential, supra, 962 F. Supp. at 563). In sum, "[t]he scope of discovery to be conducted in each case rests with the sound discretion of the trial judge." Cotton v. Hinton, 559 F.2d 1326, 1333 (5th Cir. 1977).

In the case at bar, Objectors respectfully request that the Court exercise its discretion and permit tailored discovery on the following issues prior to the scheduling of the fairness hearing should this Court not reject the proposed settlement class and/or settlement on the briefs submitted:

(1)     When did Horizon make the decision to stop using the Ingenix and TOR databases?

(2)     Why did Horizon make that decision and the bases it relied on in making that decision?

(3)     What databases or methodologies is Horizon using in place of the Ingenix and TOR databases to calculate ONET fees going forward?

(4)     Why did Horizon make those decisions and the bases it relied on in making those decisions?

(5)     What due diligence, studies, analyses, etc. did Horizon undertake when it determined to replace Ingenix and TOR to evaluate how the new databases or methodologies would calculate ONET fees as compared to Ingenix and TOR?

(6)     What analysis/valuation, if any, was undertaken by the settling parties to determine if, in fact, the proposed settlement has any benefit to the Class and what the value of that benefit is?

(7)     What due diligence did Mr. Nagel undertake to ascertain what database(s) would be replacing Ingenix and TOR and whether the use of the new databases would result in more accurate ONET fees and thus address the purpose of why these class actions were filed in the first place?

We will write directly to Mr. Nagel and Horizon's counsel requesting the voluntary disclosure of this discovery. If the settling parties refuse to produce the requested discovery, or it does not exist, Objectors will seek leave to serve limited interrogatories, document demands and deposition notices as may be required.

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should not certify a settlement class and should

deny final approval to the proposed class action settlement and any fee application.

Respectfully submitted,

**MAZIE SLATER KATZ & FREEMAN, LLC**
Attorneys for Various Objectors


BY:___*/s/ Eric D. Katz*
      ERIC D. KATZ

DATED:  February 28, 2014

45

## RIDER "A"

### "Subscriber" Class Member Objectors (D.E. 321-24)

Linda A. Essig
Suzanne Fein
Susan Hagy Pizzi
Jennifer Scheer

### "Provider" Class Member Objectors (D.E.  325-26)

Robert Hager, P.A.-C.
*Kirsch v. Horizon Blue Cross Blue Shield* Settlement Class

### Non-Class Member Physician Objectors (D.E. 327-35)

Hooman Azmi, M.D.
Anthony A. Chiurco, M.D.
Feona Gupta, M.D.
George Kaptain, M.D.
Reeza Karimi, M.D.
Francis J. Pizzi, M.D.
Patrick Roth, M.D.
Harshpal Singh, M.D.
Roy Vingan, M.D.

### Non-Class Member Physician Group Objectors (D.E. 336-40)

Anthony A. Chiurco, M.D., LLC
Comprehensive Neurosurgical, P.C. d/b/a North Jersey Brain & Spine Center
GEM Ambulance*
Neuro-Group, P.A.
Francis J. Pizzi, M.D., LLC

### Non-Class Member Association Objectors (D.E. 341-42)

New Jersey Neurosurgical Society
New Jersey Spine Society


\* GEM Ambulance is moving for intervention as a Non-Class Member Objector in an abundance of caution because it was advised by proposed class counsel that it was not a member of the "Provider" Class despite falling clearly within the definition of that sub-class.  GEM Ambulance maintains that it has a direct right to object as a member of the "Provider" Class. See Certification of Julie Eisemann, GEM Ambulance's Director of Administration, filed with the Non-Class Members' motion to intervene.